The **BABCOCK & WILCOX COMPANY**, Plaintiff,

v.

**UNITED TECHNOLOGIES CORPORATION**, Defendant.

Civ. A. No. C77–124A.

United States District Court, N. D. Ohio, E. D.

July 15, 1977.

---

Gary A. Banas, Canton, Ohio; Buckingham, Doolittle & Burroughs, Akron, Ohio; Edward W. Keane, Richard E. Carlton, Richard J. Urowsky, Sullivan & Cromwell; Carroll E. Neesemann, Parker, Auspitz, Neesemann & Delehanty; Bernard W. Nussbaum, Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff.

Richard E. Guster, Roetzel & Andress, Akron, Ohio; William C. Pelster, P. Jay Wilker, John H. Nannes, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff The Babcock & Wilcox Company (hereinafter B&W) initiated this action on April 4, 1977, seeking to permanently enjoin the proposed tender offer of defendant United Technologies Corporation (hereinafter U.T.) for the outstanding common stock of B&W. In light of the urgency of this matter to the parties, the Court has endeavored to hear and resolve the issues presented as expeditiously as practicable. The following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

## I. FACTUAL BACKGROUND

The Babcock and Wilcox Company is a publicly held corporation duly organized and existing under the laws of the State of New Jersey. Its corporate headquarters are located in New York, New York, but it has substantial facilities within northeast Ohio.

B&W is a manufacturer of four broad classes of products: steam generating and associated equipment, including fossil steam boilers and nuclear steam systems, for utility, marine, and industrial applications; automated machines and machine tools; refractory products; and tubular products. The industries served by these B&W products, exclusive of electric utilities and the U. S. Government, include the following: machine; chemical and petroleum; transportation; metal and metal products; and pulp and paper.

United Technologies Corporation is a publicly held Delaware corporation. Its principal executive offices are in Hartford, Connecticut, although it has facilities located in 23 states. U.T. is engaged in the design, development, and manufacture of products within three rather clearly defined spheres or lines of business: power, systems, and industrial. Products within its power line include aircraft jet engines, gas turbines, solid propellant rocket boosters and motors, and rocket engines. Examples of its systems products are automotive systems and controls, helicopters, flight systems, and space equipment. Finally, U.T.'s industrial line of business is typified by products such as elevators and escalators, and wire, cable, and electrical circuit systems and control devices for the transmission and control of electrical energy. These high technology products are utilized in the aerospace, automotive, electrical communications, construction, and other industries.

In late February 1977, U.T., after an extensive study of B&W with a view toward acquisition, initially contacted B&W ostensibly to discuss research and development concepts. During the ensuing series of conversations between top level management of the respective corporations, U.T. proposed a merger, pointing to the advantages and benefits to be derived from such a combination. It was U.T.'s hope that a friendly merger could and would be effected.

Thereupon, B&W's senior officials engaged in internal discussions concerning

U.T.'s proposal and undertook a review thereof. As a result, B&W's management informed U.T. that the enthusiasm for the proposed merger was not shared, and that it envisioned possible antitrust and other legal problems. Despite B&W's apparent lack of interest in the combination, U.T. nonetheless decided to pursue the matter.

Subsequently on March 28, 1977, U.T. transmitted to B&W documents containing the proposed tender offer for B&W's common stock and a suggested press release. The following morning in a conversation between top executives of the two companies, B&W privately responded negatively to the proposal.

On the afternoon of March 29, 1977, U.T. publicly announced that it proposed to offer to purchase all the outstanding common stock of B&W at a price of $42 per share, which represented a 20% premium over the previous day's closing market price. Such proposed tender offer, if made, obligates U.T. to purchase all shares tendered by B&W shareholders within a specified period of time. U.T.'s obligation to purchase is, however, subject to its retained right to terminate the offer upon the occurrence of certain contingencies delineated in the offer itself. It is further contemplated that at such time as the offer is made, an Offer to Purchase meeting the requirements of the Securities and Exchange Commission with regard to full disclosure of material information will be made available to all B&W shareholders.

By letter dated March 29, 1977, B&W expressed its intention to further study the proposal, and its opinion that to act without so doing in light of the magnitude of the undertaking would clearly be improper. Following this letter, there was an exchange of correspondence between U.T. and B&W relative to the proposal and their respective positions. Further, on March 31, 1977, B&W itself issued a press release stating that its Board of Directors, in considering U.T.'s proposal, deemed it advisable to secure additional information on the adequacy of the offer, and on what it viewed as serious legal problems attendant thereto.

After additional correspondence in which U.T. again suggested discussions between the two and B&W rejected the proposed offer, B&W sent a letter dated April 4, 1977 to its shareholders. In that letter, B&W stated that it had rejected U.T.'s proposal to acquire B&W, and that it had filed suit in federal court seeking an injunction to block U.T.'s alleged illegal attempt to gain control of B&W.[1] The lawsuit referred to therein is the instant action.

## II. PLEADINGS

Plaintiff's complaint herein was filed as stated above on April 4, 1977 requesting equitable relief in the form of a permanent injunction. The jurisdiction of the Court is invoked pursuant to 15 U.S.C. §§ 15, 22, and 26; 42 U.S.C. §§ 2234, 2239, and 2273; 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1332, and 1337.

The complaint sets forth twelve claims for relief. Essentially it alleges violations of the Clayton Act, 15 U.S.C. § 12 et seq.; the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq.; the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.; the Ohio "Take-over bid" statute, Ohio Revised Code § 1707.041; and the common law.

Specifically, the Third Claim for Relief asserts that U.T.'s proposed tender offer absent full disclosure of its voluntary reviews of allegedly "questionable payments" made by U.T. and its subsidiaries would violate Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e). The

1. B&W further indicated that it would request hearings under the New York and Ohio takeover statutes. The Division of Securities for the State of Ohio held hearings with regard to U.T.'s offer at the request of B&W. On May 23, 1977, the Hearing Examiner recommended to the Division that U.T. be allowed to go forward with its proposed tender offer subject to one minor modification. Thereafter, the Division adopted the findings and recommendations of the Hearing Examiner by an order dated June 3, 1977. B&W thereupon filed, on June 6, 1977, a notice of appeal of that order to the Franklin County Court of Common Pleas in Columbus, Ohio. Said action has not to date been resolved.

Likewise, B&W has requested hearings under the securities laws of Arkansas, New Jersey, and New York.

Court, with the full consent of the parties, referred this claim to a Special Master by its Order of May 20, 1977. The Court's review of the Special Master's Report and ultimate determination of the issues referred are contained in a separate Memorandum Opinion and Order.

In order to facilitate an expeditious trial on the merits of the other claims, the Court directed the parties to confer and submit a joint statement of the issues to be tried. On May 25, 1977, the parties each submitted their own proposed joint statement. It is clear from both these statements and plaintiff's representations that all but four claims have been withdrawn. The issues presented by three of the remaining claims are defined in the parties' statements as follows:

### FIRST CLAIM FOR RELIEF

The issue is whether the effect of United's acquisition of B&W may be substantially to lessen actual or potential competition in any line of commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. Sec. 18.

. . . . .

### SECOND CLAIM FOR RELIEF

The issue is whether United may proceed with its offer without first obtaining the prior written consent of the Nuclear Regulatory Commission to the transfer of control of B&W's nuclear licenses pursuant to Section 184 of the Atomic Energy Act, 42 U.S.C. Sec. 2234.

. . . . .

### FIFTH CLAIM FOR RELIEF

The issue is whether United's proposed disclosure of the matters alleged in the first three causes of action is adequate.

The fourth claim is that referred to the Special Master.

With regard to the Fifth Claim, the third cause of action alluded to is the questionable payments claim discussed above. Further, this last claim is based on U.T.'s asserted inadequate or misleading disclosure of information regarding alleged antitrust problems, Nuclear Regulatory Commission

licenses, and the questionable payments in violation of Section 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(e).

Defendant U.T. has essentially denied all the allegations contained in plaintiff's claims for relief. U.T. has also filed a counterclaim, which alleges that B&W has made numerous materially false and misleading statements concerning the proposed tender offer to its shareholders and the public in violation of Sections 14(d) and (e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(d) and (e). A permanent injunction barring such further and future violations by B&W is sought. Additionally, U.T. requests relief in the form of a current, complete, and accurate list of B&W shareholders in order that it may communicate with them to correct the alleged misstatements of B&W.

### III.  STANDING

Prior to addressing B&W's claims, the Court finds it appropriate to dispose of U.T.'s argument that B&W lacks standing to prosecute the antitrust claims. Specifically, U.T. argues that plaintiff lacks standing because it has failed to prove that it will be injured "by a violation of the antitrust laws" as required by Section 7.

■■■■ This argument confuses standing with an element of an antitrust claim. As stated by the Sixth Circuit Court of Appeals:

"  .   .   . standing is a preliminary determination ordinarily to be evaluated upon the allegations of the complaint. As a result, a party may make sufficient allegations to demonstrate the necessary standing to sue but fail to prove his case on the merits."

*Malamud v. Sinclair Oil Corporation*, 521 F.2d 1142, 1150 (1975).[2] Standing exists if a plaintiff alleges injury in fact and if it appears that the interests the plaintiff seeks to protect are arguably within the zone of interests to be protected. *Id.* at 1151. See also *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

---

**2.**  While *Malamud* was initiated under Section 1 of the Sherman Act and Section 3 of the Clay-

ton Act, its principles are fully applicable herein.

This two pronged test has been satisfied herein; B&W has standing to sue. Whether it has proven its case on the merits is an entirely different question.

## IV. ANTITRUST

Section 7 of the Clayton Act proscribes a merger where "in any line of commerce in any section of the country, the effect [thereof] may be substantially to lessen competition . . . ." Mergers are classified for analysis under this section as horizontal, vertical, conglomerate, or product-extension. B&W asserts that each characterization may be applied to the instant proposed acquisition and that under each analysis it would violate Section 7.

## A. HORIZONTAL

Horizontal merger analysis must include discussion of several areas of asserted competition between the parties. Specifically, B&W argues that it competes with U.T. for sales of: 1) electric generation equipment to domestic utilities; 2) marine propulsion systems to commercial and naval purchasers; 3) power generation equipment to non-utility, non-marine industries; 4) services and construction of power generating systems and plants for utilities; 5) waste incineration/generation equipment; and 6) research and development of power generation equipment.

## 1. UTILITIES

The demand for electricity in this country is constantly rising and no doubt will continue to do so in the foreseeable future. The electric utilities are able to meet this demand today only because years ago provision was made for adequate generation capability. Decisions affecting the sufficiency of our supply of electricity in coming years are being made today.

These decisions are based on forecasts of demand for electricity from now through the 1990's. The long term nature of the decisional process is necessitated by both the long lead time required for the installation of the subject machinery and the long life of such generation equipment. Lead times extend up to ten years and this equipment has a useful life of thirty to forty years.

Once the decision to add generation capability is made, an electric utility considers numerous factors in choosing a product to fulfill its needs. Such factors include: the initial capital cost and capital availability; the total estimated lifetime cost of operating the equipment, which includes fuel costs and maintenance; the reliability of the equipment; regulatory and environmental concerns; transmission costs; and lead times for installation. The most important single factor is lifetime operating cost, and fuel costs are the most important element in this calculation.

Another consideration of electric utilities in this regard is the proposed function of the equipment. Utilities operate power generation equipment in three general ways: baseload, cycling, and peaking. Baseload equipment is operated virtually continuously; such operation results in a low cost per kilowatt hour. Cycling equipment is operated on a regular or fairly regular basis, but not continuously, because of its higher per kilowatt hour cost. For example, such equipment might be needed daily during hours of high demand and then shut down at night. Peaking equipment is generally used only during hours of maximum demand. Either the limitations of the subject technology or the high operating cost of the equipment act as a barrier to utilization of peaking equipment for baseload or cycling purposes.

The potential purpose of the proposed equipment is not an immutable element in a utility's decisional process. Sometimes, as explained below, the lines between these functions are blurred by the exigencies of circumstance. However, utilities can and do make purchases on the basis of the perceived need in their system for a particular functional classification of generation equipment.

Of the factors listed above, one of the more important is lead time. If a utility has correctly forecast future needs and made adequate provision therefor, it will have sufficient time in which to select and install the equipment best suited to its needs. In other words, its choices are broad and the remaining factors exercise their proper role in the selection process. However, where a utility has incorrectly forecast future demand or for some other reason finds itself confronted with an immediate, unplanned need for generation equipment, the choices are much more limited and a utility may be forced to purchase certain equipment regardless of the dictates of the other factors. The significance of this fact is established when it is recognized that approximately ten years are needed to install a nuclear steam electrical generation plant; that approximately eight years are needed to install a fossil fired steam electrical generation plant; and that only two years or less are needed to install gas turbine generation capability.

Utilities actually choose between competing technologies for their power generation requirements. While there are many such technologies available, the commercially available choices are: gas turbine systems; nuclear steam generation systems; fossil fired steam generation systems; conventional hydroelectric systems; pumped storage hydroelectric systems; and, to a lesser extent, diesel engines. Potential future systems include: magnetohydrodynamics, fuel cells, geothermal, solar, nuclear fusion, and nuclear breeder reactors. Only the first five commercially available technologies are relevant today and for the foreseeable future.[3]

A fossil fired steam generation system consists primarily of three components.

The first is a boiler which produces steam. The steam drives a steam turbine which, in turn, drives an electrical generator which yields electricity. B&W manufactures only the boiler in such a system. These boilers may be fueled by coal, natural gas, or oil. Such systems are each capable of producing many hundreds of megawatts (Mw).[4] Their physical dimensions are quite large. In fact, such systems may be as tall as fifteen stories. As might be expected, such a system is very expensive to install; however, its operating expenses are comparatively low, especially when fueled by coal.

Gas turbines are employed in either simple cycle systems or combined cycle systems. A simple cycle system consists essentially of a gas turbine and an electrical generator; the gas turbine combines the function of a boiler and a steam turbine. Each system is capable of producing approximately thirty megawatts; however, utilities often install clusters of such systems. U.T. manufactures only the gas turbine in this system. The purchase price of these systems is comparatively low, but its operating expenses are quite high. A combined cycle system employs a simple cycle gas turbine in conjunction with a waste heat boiler system. The waste heat created by the gas turbine is employed to power a boiler, which in turn creates steam. It is thus a combination of the boiler and gas turbine systems.

Nuclear steam generation systems employ controlled nuclear fission to produce steam. The remainder of this system is essentially the same as that for the fossil fired steam system. B&W produces nuclear reactors and related materials. The capital expenditures for such systems are extremely high, but operating expenses are low.

3. To discuss each of the many potential future systems would unnecessarily lengthen this opinion. It is sufficient to state that only the fuel cell, which is being developed by U.T. and which produces electricity through chemical reaction, appears reasonably likely to be ready for commercial application within the next dec-

ade. Yet until the mid 1990's or after this system will pose no threat to those marketed by B&W because of its operating expense and technological limitations.

4. A megawatt is 1,000 kilowatts.

The pumped storage hydroelectric system uses excess electric power to pump water from a lower to an upper reservoir. When high power demands are placed on a utility possessing this system, the water is released from the upper reservoir and flows through hydroelectric generators producing electricity. The remaining systems need not be explained.

Electric utilities generally employ each of the commercially available technologies in their systems to the extent permitted. However, variations do exist. For example, some utilities have stressed oil fueled systems while others maintain only coal and hydroelectric systems. Unfortunately, the number of available sites for conventional hydroelectric generation systems is practically exhausted and most new equipment in this area is replacement in nature. Significant public opposition to nuclear plants has presented problems to their installation. Environmental concerns have similarly affected utilities' purchasing decisions regarding coal fired fossil steam systems. Generally, however, economic considerations dictate the choice of generation technology and their utilization. The result is that nuclear steam, fossil steam, and hydroelectric systems are, and in the past have been, generally used only for baseload and/or cycling. Gas turbines are generally used only for peaking.

There are exceptions to this rule. Simple cycle gas turbine systems, although comparatively small in electrical output, possess the physical capability of cycling operation and, in certain extraordinary circumstances, of baseload operation.[5] Such capability is employed, for example, where environmental considerations preclude the installation of more economical preferred systems. While environmental concerns are an element in a utility's decisional process, rarely have they mandated the installation of gas turbine systems. In view of developments in pollution control equipment and energy concerns, it is likely that simple cycle gas turbine systems will be mandated thereby very rarely in the future.

Another circumstance in which utilities purchase and operate simple cycle gas turbines for cycling and/or baseload purposes is where, because of an unexpected increase in demand for electricity or delays in the installation of planned capability installations, an "emergency" situation is created. Simply stated, when a utility needs additional generation capability quickly, only the gas turbine, with its short lead time, is available to satisfy that need in time. This "emergency" situation is the primary reason for purchasing gas turbine systems for other than peaking purposes. Its effects have been demonstrated in gas turbine sales to the present, and will probably continue at reduced levels for the next decade. However, because of the cost inefficiency of a gas turbine system, the utility will so employ it only until a more acceptable generation system, such as fossil or nuclear steam, can be installed.

The cost inefficiency of gas turbine systems results from fuel costs. Gas turbine systems are fueled by natural gas or high grade oil distillates. As is common knowledge, the price of oil has risen sharply in recent years and the clear trend is for further increases in the future. While interstate gas prices have remained relatively constant, intrastate gas prices have also risen sharply. Similarly, the outlook for future availability of these fuels for electric power generation is less than certain. Natural gas is now in short supply, and most probably will not be available to utilities in sufficient quantities to merit the future installation of natural gas fueled generation systems. Oil, while more plentiful, faces the prospect of future embargoes and political action designed to preclude its availability to utilities. The twin concerns of escalating oil and natural gas prices and impaired availability render generation systems based on said fuels a risky investment of capital desperately needed elsewhere. The electric utility companies are acutely

5. The present likelihood of operating gas turbine systems for baseload is minimal because of the small megawatt capability of present gas turbine systems.

aware of these problems; they have and are altering their purchasing decisions accordingly. These considerations render uneconomical, either presently or in the foreseeable future, the use of either simple cycle or combined cycle gas turbine systems for use other than peaking. Only coal and nuclear systems, and to a lesser extent hydroelectric systems, represent economically viable alternatives for baseload and/or cycling functions.

There is significant research being conducted by numerous corporations into coal gasification and coal liquification. However, this research is not likely to produce a commercially competitive product within at least the next decade. If and when such processes are commercially available, the economic feasibility of simple cycle or combined cycle gas turbines will not be significantly enhanced before at least 1990 or 1995. For example, the higher efficiencies of a combined cycle gas turbine system will be diminished by the use of low BTU coal gas; this reduction when combined with the comparatively high cost of such fuels will essentially preclude the large scale application of this technology for many years hence. Simple cycle gas turbine systems, which do not have the advantage of higher fuel efficiency, are even less likely to expand their function beyond peaking.

Gas turbine systems presently being developed or considered will have significantly greater generation capability per unit. Thus, if their operation were economical, they could better be utilized for cycling and/or baseload purposes. However, the market climate has caused U.T. to suspend its development of such a gas turbine, the FT50. In view of both present and future fuel conditions, it is unlikely that even these larger gas turbine systems will obtain significant acceptance by utilities within the foreseeable future for purposes other than peaking.

Simply stated, gas turbine systems are purchased and operated by utilities only for peaking, absent extraordinary circumstances. This state of affairs will, most probably, continue into the foreseeable future and the exceptions will probably decline in importance. On the other hand, such technologies as nuclear and fossil steam systems are generally purchased and operated by utilities only for baseload and cycling.

With these considerations in mind, meaningful, though limited, statistical analysis may be pursued. There are essentially five indicators which must be examined to grasp the significance of gas turbine technology to the electric utilities. They are: orders; additions to capability by year; total electrical generation capability nationwide; power generated by each technology; and capital expenditures for each technology. Megawatts is the standard unit employed for measuring each of the first four indicators.

Each of these indicators provides insight into the problem and each has limitations to its value. None of these indicators is sufficient for analysis alone. Discussion of the strengths and weaknesses of each indicator is necessary to an assessment of their worth.

"Orders," as the name suggests, are purchase orders placed by electric utilities for generation equipment. They thus reflect the market activity for the relevant period of time and, to the extent reliable, they must be considered a prime indicator of market activity. Unfortunately, there is a span of time, often years, between placing an order and production and installation. Orders are occasionally cancelled and although each of the order studies presented professes to correct for cancellations, the wide disparities in the data suggest to the contrary. Further, it appears that different persons may record an order in different years. One observer may record as an order what turns out to be only a tentative agreement. These facts render less than reliable the order statistics presented. At

most, general trends may be validly discerned.

"Additions" measure additions to generating capability by year. Insofar as this indicator relates to years before 1977, it is quite accurate because the complications resulting from cancellations and the varying definitions of orders are eliminated. Of course, future estimates, as with any indicator, are subject to other considerations which will be discussed below. One disadvantage to an additions analysis is that this indicator reflects market activity occurring years before. For example, an addition of a fossil steam system in 1976 reflects a utility's choice in approximately 1968. However, an addition to gas turbine capability in the same year reflects market decisions only approximately two years old. These variations, while complicating the analysis process somewhat, provide an opportunity for meaningful analysis.

Total electrical generation capability reflects the maximum output of the equipment in place or, in the industry vernacular, "on line." This indicator therefore contributes a broader perspective as to how utilities "mix" their generation equipment. Of course, since much of the capability measured at any one point in time represents decisions made years before, this indicator only indirectly reflects market activity.

The power generated by each technology complements each of the other indicators by showing how utilities employ their capability. However, this data has little relationship with market activity.

Capital expenditures measures dollars spent by electric utilities in capital formation. It is valuable only because it tends to reflect the economic worth of the various systems to the utilities. However, for each year reported, such data reflects commitments of prior years and thus is of limited utility in measuring present market conditions. Furthermore, since gas turbine systems cost much less to purchase than other systems, their role is undervalued.

Each of these indicators also has another limitation. The integrity of the study and/or reporting mechanism upon which the data is predicated is extremely important in assessing its reliability. The Court has already touched on this problem relating to orders. However, the Court finds that the sources described below for the remaining indicators are generally reasonably reliable.

One further qualification must be recognized. Insofar as any of these indicators purport to forecast future demand for the subject generation equipment, a possibility of error inherently arises. As the utilities know, and as this Court has discovered, forecasting future trends in this industry is a very risky business; assessing forecasters is even more difficult. Each forecast is predicated upon certain assumptions which may or may not prove correct. In any event, based on the evidence presented, the Court concludes that the forecast data presented below comports as closely as possible with the most realistic, and generally the utilities', expectations of the future.

For the purposes of this opinion, and subject to qualifications discussed above, the Court has chosen to discuss the orders data contained in Plaintiff's Exhibits H-1 through H-6. This data was derived generally from certain reports of Kidder Peabody & Co., and from reports of the Association of Edison Illuminating Companies. It measures orders placed by domestic electric utilities for nuclear steam, fossil steam, and gas turbine systems only. While the Court believes that it improperly excludes hydroelectric and pumped storage systems, and therefore exaggerates the importance of gas turbine systems, this omission will not prove relevant.

Chart I indicates the orders for these technologies by year and the percentage thereof attributable to gas turbine systems. The parties' respective shares of this defined market are as depicted in Chart II.

## CHART I

### YEAR (Mw)

| | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 72-76 | 67-76 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fossil Steam | 25,147 | 23,171 | 27,075 | 30,047 | 16,313 | 16,835 | 25,894 | 33,498 | 10,824 | 6,312 | 93,363 | 215,416 |
| Nuclear Steam | 25,592 | 12,900 | 7,301 | 14,619 | 12,987 | 31,334 | 38,924 | 20,245 | 5,488 | 3,720 | 99,711 | 173,110 |
| Gas Turbine | 3,017 | 3,771 | 6,855 | 6,450 | 6,826 | 6,596 | 6,626 | 2,496 | 4,689 | 2,400 | 22,807 | 49,726 |
| %Gas Turbine | 5.6 | 9.4 | 16.6 | 12.6 | 18.9 | 12.1 | 9.3 | 4.4 | 22.4 | 19.3 | 10.6 | 11.3 |
| Total Orders | 53,756 | 39,842 | 41,231 | 51,416 | 36,126 | 54,765 | 71,444 | 56,239 | 21,001 | 12,432 | 215,881 | 438,252 |

## CHART II

### YEAR

| % | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 72-76 | 67-76 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B&W | 30.9 | 24.7 | 27.7 | 18.9 | 12.7 | 19.3 | 18.7 | 23.0 | 28.8 | 42.6 | 22.3 | 22.9 |
| U.T. | 1.9 | 2.8 | 6.4 | 3.8 | 7.6 | 1.5 | 0.7 | 0.2 | 2.3 | 7.6 | 1.3 | 2.8 |

1262

This data indicates that gas turbine systems have constituted a significant portion of the orders for the technologies included. It further demonstrates the substantial share of such a market enjoyed by the parties.

Yet this raw data must be carefully examined if misjudgments are to be avoided. For example, the first chart demonstrates a marked growth in orders for gas turbine systems in 1969. This phenomena reflects the unexpected demands on utilities' capabilities, and the resulting "brown outs" and "black outs," experienced in 1968–69. Gas turbine orders then remained relatively steady through 1973 as utilities endeavored to quickly build capability to meet demand. The variations in gas turbine systems' percentage share of this defined market for these years resulted primarily from changes in the orders placed for the two other technologies. Gas turbine system orders peaked in 1971.

The total orders for 71,444 Mw in 1973 were the highest in the reported period. Gas turbine systems enjoyed a 9.3% share of this market, on orders of 6,626 Mw. In 1974, utilities placed the second highest total orders for the reported period. Yet orders for gas turbine systems dropped disproportionately to 2,496 Mw. This drastic decrease may be directly attributed to the 1973–74 oil embargo, and its resulting impact on oil fueled systems such as gas turbines. Yet gas turbine system orders jumped in 1975 to 4,689 Mw, or 22.4% of total orders in the subject market. The gas turbine new orders for that year were appreciably less than the orders plateau of 1969–73, but the percentage share of the market enjoyed by gas turbine systems was the highest for the reporting period.

After the oil embargo, electric utilities began a reassessment of their oil system capability. The uncertainty of future oil supplies; a decreasing rate of growth of consumer demand for electricity; excess capability, both actual and on order; and capital shortages resulting from limited revenues caused utilities to cancel orders and/or defer new purchases. Therefore orders for fossil and nuclear steam systems tumbled dramatically in 1975 and remained uncharacteristically low in 1976. It appears that utilities are now beginning to place orders at more normal levels.

During this "artificial" market, gas turbine systems' percentage share of this market became exaggerated. The orders placed in 1972, for example, for fossil and nuclear steam were, in 1975, still approximately five to seven years from completion. Yet some utilities found that they had incorrectly forecast their individual systems' needs for generation equipment or that unexpected delays in the installation of steam systems left gaps in their systems' capability versus projected requirements until the steam systems' installation. Thus "stop gap" ordering of gas turbine systems occurred. This ordering did not replace steam systems; it merely enabled the utilities to meet demand until these preferred systems could be on line.

New capability additions by year is the second indicator to be discussed. Additions analysis will proceed in two parts. The first will be a historical examination and the second will concentrate on planned future additions.

Chart III shows actual additions to capability by technology and year.[6] The percentage shares of the total are also given.

Before discussing this chart, it must first be noted that the 1972 addition of 9,493 Mw of internal combustion systems was most unusual and is neither repeated during the years reported nor is it likely to be repeated in the future.

6. This information and that contained in Chart IV are derived from certain reports published in Electrical World, a publication which the utility industry and the Court deem reliable.

Chart III indicates both the dominance of fossil steam systems in additions for the reported years and the significance of gas turbine systems. The only comments necessary are to note the dramatic drop in additions of gas turbine, fossil and nuclear steam systems in 1976; and the diminishing role of gas turbine systems after 1974.

Comparison of Charts I and III suggests significant delays and/or cancellations of orders. First, considering the lead times necessary for the addition of fossil and nuclear steam systems, the 1976 additions for these systems are unusually low. Second, the total installation for each year in Chart III is significantly lower than total orders, insofar as indicated, for the years which would be expected to have contributed to on line capacity in 1972–76.

A comparison of the electric utilities' planned future additions for fossil steam systems to actual additions demonstrates significant disparities, commencing about 1967 or 1968. For every year thereafter actual additions were significantly lower than planned two or three years before. Not coincidentally, planned and actual additions of gas turbine systems jumped accordingly.[7] When the long lead times for nuclear and fossil steam systems are recalled, and since therefore estimates of additions two or three years later are made while the actual construction process is presumably well advanced, this slippage must primarily be ascribed to delays as opposed to cancellations. This data also infers that gas turbine systems were being installed as a stop gap measure until the steam systems could be on line.

This inference is strengthened by examination of the utilities' planned future additions in years past for gas turbine systems only. For example, as of January, 1969, electric utilities planned the following gas turbine system additions:

| 1969 | 1970 | 1971 |
|------|------|------|
| 4,107 Mw | 2,261 Mw | 256 Mw |

Assuming approximately a two year lead time for such additions, the planned additions for 1969 and 1970 most probably were already ordered or definitely planned. The marked reduction in planned additions for 1971 shows that the utilities' demand for gas turbine systems was not uniform, and it suggests that the perceived need for such systems in 1969 and 1970 was artificially high. Chart IV develops this planned additions analysis for gas turbine systems from 1969 through January 1977.

7. See Defendant's Exhibits 78 and 79.

CHART III

YEAR

| | 1972 | 1973 | 1974 | 1975 | 1976 | Total 72-76 |
|---|---|---|---|---|---|---|
| Fossil Steam | 16,527 Mw (44.57%) | 19,773 Mw (54.87%) | 20,200 Mw (52.46%) | 20,982 Mw (57.26%) | 12,753 Mw (54.10%) | 90,235 Mw (52.51%) |
| Nuclear Steam | 6,143 Mw (16.57%) | 6,367 Mw (17.67%) | 11,501 Mw (29.87%) | 10,278 Mw (28.05%) | 4,685 Mw (19.87%) | 38,974 Mw (22.68%) |
| Gas Turbine | 4,149 Mw (11.19%) | 4,886 Mw (13.56%) | 5,626 Mw (14.61%) | 3,356 Mw (9.16%) | 2,096 Mw (8.89%) | 20,113 Mw (11.70%) |
| Hydro-Electric | 368 Mw (0.99%) | 1,311 Mw (3.64%) | 204 Mw (0.53%) | 1,555 Mw (4.24%) | 3,739 Mw (15.86%) | 7,177 Mw (4.18%) |
| Pumped Storage | 398 Mw (1.07%) | 3,622 Mw (10.05%) | 928 Mw (2.41%) | 305 Mw (0.83%) | 0 Mw (0%) | 5,253 Mw (3.06%) |
| Internal Combustion | 9,493 Mw (25.60%) | 77 Mw (0.21%) | 45 Mw (0.12%) | 168 Mw (0.46%) | 301 Mw (1.28%) | 10,084 Mw (5.87%) |
| TOTAL | 37,078 Mw | 36,036 Mw | 38,504 Mw | 36,644 Mw | 23,574 Mw | 171,836 Mw |

## CHART IV

### PLANNED ADDITIONS PER YEAR FOR GAS TURBINES

| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1969 | 4,107 | 2,261 | 256 | | | | | | | | |
| 1970 | | 5,824 | 3,220 | 612 | | | | | | | |
| 1971 | | | 6,628 | 3,031 | 1,916 | | | | | | |
| 1972 | | | | 6,163 | 3,140 | 2,625 | | | | | |
| 1973 | | | | | 5,271 | 6,253 | 1,804 | | | | |
| 1974 | | | | | | 6,348 | 2,835 | 2,672 | | | |
| 1975 | | | | | | | 3,559 | 2,674 | 978 | | |
| 1976 | | | | | | | | 2,647 | 1,069 | 1,386 | |
| 1977 | | | | | | | | | 1,935 | 1,669 | 1,528 |

Examination of this chart reveals a pattern of diminished planned additions for gas turbines beyond the two year lead time. It also reveals the diminishing role of gas turbine systems. When it is recognized that the slippage problem for installation of steam systems began improving slightly around 1974; and that utilities were generally finding that their actual and ordered capabilities were sufficient to meet consumer demand from 1974 through 1976, this diminished role is consistent with the gas turbine's stop gap and peaking role.

Chart IV also demonstrates that gas turbine systems are continuing to diminish in utilities' plans for 1977 and thereafter. For example, gas turbine systems were, as of January, 1977, planned to constitute 5.94% of additions in 1977; 5.46% of additions in 1978; 4.97% of additions in 1979; and 3.64% of additions for 1980 and after. While these percentages are still slightly higher than those for a "pure" peaking system, they are much more in line with such figures. The difference is merely reflective of the now more limited stop gap role.

The next indicators are installed generation capability and electricity generated by each technology. According to the National Electric Reliability Council, the total United States' installed electric generation capability as of December 31, 1976 was 503,-302 Mw. The capability of installed simply cycle gas turbine systems was 41,807 Mw, which represented 8.3% of total capability.

Combined cycle gas turbine systems were 3,901 Mw of capability as of that date, which represented 0.775% of the total installed capability. Together the simple and combined gas turbine systems represented approximately 9.09% of total generation capability.

Yet while gas turbine systems hold a significant share of total generation capability, their actual output of electricity in 1976 was *de minimus*. The simple cycle gas turbine systems produced only approximately 0.99% of the electricity generated in 1976. Combined cycle systems produced only approximately 0.64% of said total. Together these gas turbine systems accounted for only about 1.63% of total generation. Obviously gas turbine systems are not being used to their full capability. The National Electric Reliability Council projects that in 1985 gas turbine systems, both simple and combined, will constitute an even smaller percentage of both capability and generation. This low utilization rate suggests that gas turbine systems are almost uniformly used for peaking only. The stop-gap capability was primarily kept in reserve.

The final indicator to be discussed is capital expenditures. This is the least important of the five indicators, but it does demonstrate to some extent the relative economic value to electric utilities of the various systems. Chart V demonstrates capital expenditures in thousands of dollars for the years reported.

## CHART V

### SYSTEM

|      | Fossil Steam | Gas Turbine | Nuclear Steam | Hydro-Electric | Pumped Storage |
|------|-------------|-------------|---------------|----------------|----------------|
| 1972 | 4,825,518   | 512,705     | 3,589,382     | 407,364        | 365,272        |
| 1973 | 5,611,852   | 565,323     | 3,803,832     | 603,878        | 296,757        |
| 1974 | 6,454,715   | 631,544     | 4,689,689     | 496,965        | 200,139        |
| 1975 | 6,526,508   | 452,846     | 5,166,676     | 387,634        | 171,814        |
| 1976 | 7,953,701   | 274,274     | 7,140,888     | 536,387        | 260,250        |

Analysis of this chart must begin by again observing that the initial cost of gas turbine systems is significantly lower than that of fossil and nuclear steam systems. While this might suggest that gas turbine systems would be preferred over steam systems, the facts are to the contrary as demonstrated by analyses of orders and additions. Chart V essentially demonstrates the relative insignificance of gas turbine systems for the years reported. The dollar expenditures for gas turbine systems most closely approximated those for pumped storage systems.

The statistical analysis of all five indicators provides cogent support for the Court's findings, but it is by no means the sole basis therefor. Statistics cannot be validly interpreted in a vacuum, and the testimony and other exhibits have provided the Court with the necessary information to interpret the statistical evidence.

■ Section 7 of the Clayton Act proscribes mergers which may substantially lessen competition in "any line of commerce." Thus a "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act . . . ." *United States v. E. I. Du pont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957). See also *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The parties agree that the relevant geographic market is the United States of America. The Court concurs.

However, no such unanimity of opinion exists as to the product market. B&W argues that the product market consists of electric generation systems powered by gas turbines, fossil boilers, and nuclear reactors. U.T. argues to the contrary. It is clear to the Court that each of these technologies can be considered to be a separate line of commerce. Whether they also fall within the same line of commerce is the issue which is determinative of this claim.

■ The "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. at 325, 82 S.Ct. at 1523–24 (footnote omitted). However, it must be remembered that the touchstone of the inquiry, in fact the purpose of the examination of the above mentioned factors, is "recogni[tion of] competition where, in fact, competition exists." *Brown Shoe Co. v. United States,* 370 U.S. at 326, 82 S.Ct. at 1524; *United States v. Continental Can Co.,* 378 U.S. 441, 453, 84 S.Ct. 1738, 1745, 12 L.Ed.2d 953 (1964).

There is no doubt that, for example, both fossil steam and gas turbine systems produce electricity. In that sense these systems are substitutes for each other. However, it is also clear that gasoline engines, windmills, fuel cells, and solar energy collectors can generate electricity; yet none of these systems are presently commercially feasible alternatives for electric generation by utilities and must therefore be excluded from consideration.

The point of this illustration is that the mere fact of physical capability to produce electricity is insufficient to establish competition or reasonable interchangeability of use. Economic limitations must be recognized in defining a product market. To paraphrase Mr. Justice Douglas in his opinion for the majority in *United States v. Aluminum Company of America,* 377 U.S. 271, 276, 84 S.Ct. 1283, 1287, 12 L.Ed.2d 314 (1964), ". . . to ignore [economics] in determining the relevant line of commerce is to ignore the single, most important, practical factor in the business."

Economic considerations raise a potent barrier to substitution of gas turbine systems for fossil and nuclear steam systems or vice versa.[8] Gas turbine systems are substantially more economical to operate for peaking purposes than either nuclear or

8. This analysis assumes that large scale substitution is technologically feasible, a proposition which is doubtful with present generation gas turbine systems.

fossil steam. Conversely, nuclear and fossil steam are substantially more economical to operate for cycling and baseload purposes than gas turbine systems. Utilities and the manufacturers of the component parts of these systems recognize this simple fact. The cost disparities are so substantial that utilities purchase gas turbine systems only for peaking purposes unless there is unanticipated demand for electricity, delay in installation of other systems or if non-economic considerations exclude other systems.

Examples of the first exception include "brown-outs" or "black-outs" experienced by consumers in the late 1960's. As a result thereof, utilities literally scrambled to install additional capability; only gas turbines could be installed within the requisite time period. Similarly, the considerable delays in installation of nuclear and fossil steam systems experienced by utilities in the early 1970's created a "gap" in their generation reserves requiring immediate capability additions. Finally, gas turbine systems have been installed where, for example, environmental concerns and the lack of adequate alternative technology to meet said concerns, precluded consideration of other systems.

The unanticipated demand for electricity and the delay in installation of other systems do not constitute evidence of reasonable interchangeability. First, the "emergency" characterization belies consideration of it as a "reasonable" substitute. Second and most important, the evidence does not establish that the installation of gas turbines caused utilities, to any significant degree, to defer or decline to place orders for nuclear or fossil steam systems.

Nor do non-economic considerations evidence reasonable interchangeability in the circumstances of this case. It is established that operating cost is the single most important factor in both the selection and operation of electric generation equipment. Suspension of this fact occurs only under the most extraordinary circumstances; it has only rarely happened in the past and the probabilities of significant repetition are quite remote.

In short, the clear superiority of fossil and nuclear steam systems over gas turbine systems for baseload and cycling purposes renders gas turbines akin to diesel engines, for example, for such purposes. That is, diesel and gas turbine systems may be technologically feasible alternatives for at least cycling purposes, but they do not represent commercially viable alternatives for either cycling or baseload operations. Similarly, both technological and economic limitations effectively preclude utilization of nuclear or fossil steam systems for peaking. For example, fossil steam boilers take hours to build up pressure and hours to cool off. Thus their use for short periods of time is wasteful and commercially not acceptable.

These barriers are recognized by the utilities. There is either a zero or negative cross-elasticity of demand.

Thus at the present time, and most probably for the foreseeable future, gas turbine systems do not and will not compete with fossil or nuclear steam systems. They are not in the same market.

## 2. MARINE

Marine vessels vary enormously in size, function, and purpose. There are, for example, cargo carriers, passenger carriers, tankers, super tankers, coastal patrol vessels, and naval vessels of seemingly every description. Yet there are only four principal propulsion systems for marine purposes: diesel engines, fossil steam boiler systems, nuclear steam systems, and gas turbine systems. Only nuclear systems are not fueled by petroleum products.

B&W manufactures components for only the fossil and nuclear steam systems. Its components are designed and engineered for vessels with at least 10,000 shaft horsepower (shp). Therefore the Court shall lim-

it its discussions to vessels meeting this specification.

Although not without qualification, marine vessels are generally recognized as falling within one of two major classifications: commercial and naval. This distinction is well justified by the distinct purposes of both the vessels and their propulsion systems.

Commercial vessels are primarily designed and operated to transport people and goods. Their propulsion systems must operate economically and large variations in speed are generally not required. The dominant propulsion system for commercial vessels constructed or ordered within the last decade internationally is the diesel engine. Its reliability and fuel economy, including its ability to burn low grade petroleum products, account for this clear preference in the international market. Within the United States, however, fossil steam systems predominate. This position is deteriorating and results principally from governmental action and the lack of a domestic supplier of large, high shaft horsepower "low speed" diesel systems. As domestic manufacturers develop and begin marketing low speed diesel systems, a process which is presently underway, orders for fossil steam systems will begin to significantly decline due to the diesel systems' economic superiority.

Nuclear steam systems are simply impractical for propelling commercial vessels. Design and engineering expenses for such systems are very high. This fact plus their relatively high operating expense effectively preclude their installation in commercial vessels either presently or in the foreseeable future.

Gas turbine systems are similarly situated. Although some commercial ships have been ordered and constructed with gas turbine propulsion systems, such vessels are, generally speaking, economic failures.

Though data is scarce, the Court finds that maintenance expense and fuel costs preclude the utilization of gas turbine systems in commercial vessels. Commercial shipping companies are well aware of this simple fact, for no orders for gas turbine systems have been placed for commercial vessels in recent years.

Naval vessels must be further classified as auxiliary or combatant. Auxiliary vessels are essentially modified commercial ships and their purposes and propulsion requirements are essentially the same as for commercial vessels. Combat ships are in a vastly different category. While economy of operation is, of course, important, its impact is circumscribed by the peculiar functions of combat vessels. Cruising range and high performance are crucial elements of an effective war ship.

Naval auxiliary ships have essentially the same requirements for propulsion systems as do commercial vessels. Therefore, only diesel or fossil steam systems are, or will be in the foreseeable future, installed for propulsion purposes.

A markedly different situation exists for naval surface combat vessels.[9] Gas turbine and nuclear steam systems are the preferred propulsion systems. For example, all recent orders in this class by the navies of the United States and the United Kingdom have been for one or the other of these systems.

This ascendancy is a comparatively recent development. After World War II, fossil steam systems dominated at least as to U. S. Navy surface combat vessels, and B&W dominated the manufacture and/or design of such systems. However, in the late 1940's, B&W chose to concentrate its efforts as to marine propulsion systems solely in the United States market. As a result of this decision, B&W is not significant in the foreign market.

9. · Submarines are propelled by either nuclear or diesel systems. Since gas turbine systems are not technologically feasible for propulsion of

such vessels, submarines shall not be further discussed.

Excluding for the moment reference to nuclear systems, fossil steam systems continued unchallenged until the early to mid 1960's, when various governments began experimenting with gas turbine systems. As a result of these tests, gas turbine systems have apparently become a very significant factor in naval surface combat vessel orders.

After testing both U.T.'s FT4 gas turbine and General Electric Corporation's LM2500 gas turbine, the U. S. Navy selected G.E.'s LM2500 for the Spruance class destroyers in Fiscal Year 1970. For each subsequent new class of ships, the Navy has chosen the gas turbine system over the fossil steam system. While the U. S. Navy has not expressly stated that all future surface combat ships will be propelled by gas turbine or nuclear systems, its actions in the past and proposals for the future demonstrate that fossil steam systems are no longer seriously considered for new combat vessels.[10] Stated simply, absent major technological improvements, fossil steam systems are obsolete for new classes of naval surface combat vessels. No such technological improvements, or a reasonable likelihood thereof, have been proven by B&W.

B&W has apparently recognized the ascendancy of gas turbines over boiler systems in surface combat ships. After losing contracts for the Spruance class of ships, B&W failed to maintain its capabilities to install boiler systems in both combat and auxiliary vessels. Only recently has it begun the arduous and expensive process of preparing itself to bid on naval vessel contracts for fossil steam systems. However, B&W still is quite active in supplying components for nuclear propulsion systems to G.E. or Westinghouse and, through them, to the U. S. Navy.

Nuclear propulsion systems are generally installed in only the largest combat vessels. Although not without dissent, the policy of the United States has been, and presently continues to be, to install only nuclear systems in extremely large vessels such as cruisers and aircraft carriers. This policy has been enacted into law by Congress. See Title VIII of the Department of Defense Appropriation Authorization Act of 1975, 10 U.S.C. § 7291 note.

The power ranges for nuclear systems extend from approximately 60,000 shp to over 250,000 shp. Gas turbines are presently capable of producing 20,000 to 25,000 shp per engine. The largest gas turbine system installed in naval surface ships, the Spruance class vessels, produces approximately 80,000 shp per ship. It is apparent that, at present, the area of overlap for these two systems is comparatively narrow. It is, in fact, even less significant than these figures would suggest. The high cost of nuclear systems renders them not "preferred" at the lower power ranges for ships presently being constructed or contemplated. For example, considering surface combat ships authorized in the Fiscal Year 1970 program and thereafter, the smallest nuclear powered vessels are rated at 120,000 shp per ship. These were the Virginia class (CGN) Guided Missile Cruisers. However, it must be recognized that nuclear systems producing 60,000 shp have been installed in the past in surface combat vessels.

Thus far all thirty of the planned Spruance class destroyers have been authorized by Congress. Additionally, the Navy is in the process of adding a large number of Guided Missile Frigates, Oliver Hazard Perry class, to the fleet. The lead ship, the U.S.S. Oliver Hazard Perry (PF67) was authorized in the Fiscal Year 1973 program. Nine more have been authorized and funded. The Navy hopes to build approximately forty additional ships in this class. These ships are propelled by G.E.'s LM2500 gas turbines yielding about 40,000 shp per ship.

The only other new class of non-nuclear powered surface combat ship authorized in Fiscal Year 1970 or thereafter is Patrol Combatants-Missile.[11] The lead ship is the

---

10. The Navy of the United Kingdom has expressly stated that all future surface combat vessels will be propelled by gas turbine systems.

11. The only surface combat ships authorized since Fiscal Year 1970 which are propelled by fossil steam systems are the Landing Assault Ships—Tarawa class. These ships develop 10,-

U.S.S. Pegasus (PHM 1). These are very small ships, consisting of only 221 displacement tons. However, total shaft horsepower is over 18,000 per ship. Propulsion when hydrofoil born is by one 18,000 shp gas turbine manufactured by G.E. Standard propulsion is by two diesel engines. Suspension of the second ship authorized in this class renders suspect the future of this class of ships. The design of these ships apparently precluded the installation of fossil or nuclear steam systems.

One additional class of ships must be mentioned. The U. S. Coast Guard has ordered and commissioned two ice breakers, the Polar Star (WAGB10) and the Polar Sea (WAGB11). These two ships also possess combined propulsion systems. A diesel-electric system producing 18,000 shp per ship operates for normal cruising and three gas turbines producing a total of 60,000 shp per ship are employed for maximum power situations. The gas turbines were manufactured by U.T.'s Pratt & Whitney Aircraft Group. These ships, which are not fighting ships and which were authorized in the Fiscal Year 1971 and 1973 budgets, represent U.T.'s sole entry into the "military" marine market for surface combat ships authorized in and after Fiscal Year 1970.[12]

In fact, U.T.'s last order for a gas turbine for any military vessel was received late in 1973. U.T. is not now classified as an acceptable supplier of gas turbines to the Navy. It maintains no organized, centralized sales force for this product. Despite the fact that manufacturers can and do bid for contracts to install their propulsion systems even if they do not obtain the contract for the lead ship, U.T. has chosen not to compete with G.E. for the additional vessels in the Spruance and Perry classes. U.T.

has received no orders for its gas turbines for naval surface combat ships authorized in or after Fiscal Year 1970. Even counting the two Polar class ships in this category, these two sales represent only about 2% of the total shaft horsepower for the ships authorized, and 0% of the orders placed in or after 1974. U.T. is not now competing in this market with the FT4.

U.T.'s prospects for future naval sales of gas turbines are wholly dependent upon the development of new gas turbines.[13] U.T. is presently under contract, awarded in 1973 by the U. S. Navy, to develop a gas turbine system capable of producing approximately 30,000 shp. This engine is to be completed in 1978. An additional contract was, at least in 1975 or 1976, planned by the Navy to conduct tests of this engine, the FT9, in a commercial ship during 1978–79. If these tests are successful, the FT9 could achieve service approval from the Navy in 1980. No substantial evidence was presented regarding the current state of development of the FT9 or as to the actual likelihood that the Navy will award the second contract to U.T. If this schedule is maintained and if the tests are successful, U.T. will consider entering the market for gas turbine propulsion systems. The likelihood that U.T. will compete in the future with this product is far less than certain.

Simply stated, U.T. will sell gas turbine marine propulsion systems in the future if: (1) the FT9 proves technologically successful and achieves service approval; (2) a market for the larger gas turbines develops; and (3) if it appears reasonably likely that U.T. will obtain a sufficient share of the market to justify the expenditure of

000 shp. The first of the five ships planned was authorized in the Fiscal Year 1969 program. They represent decisions made in the mid 1960's. Therefore this class, and all other classes of ships in which the lead ship was authorized prior to Fiscal Year 1970, are excluded from analysis.

12. Assuming that these vessels are properly classified as naval auxiliary vessels, their

unique function requires a limited exception to the conclusion that gas turbine systems do not compete with diesel and fossil steam systems in naval auxiliary ships. No other exceptions have been proven.

13. B&W has failed to prove any substantial likelihood that U.T. will attempt to secure orders for its FT4 gas turbine within the foreseeable future.

funds which entry into the market will require. Fortunately for U.T., its decision to attempt to market the FT9 is not required until sometime in the future when there will be answers to a number of the subsidiary questions. The Court, however, must assess the probabilities on the basis of the present record.

As noted above, the record contains no concrete evidence regarding the current stage of development of the FT9; nor does it contain reasonably current assessments of the likelihood of its successful development. Therefore, on this record, a determination as to the likelihood of U.T.'s developing a marketable 30,000 shp gas turbine system would be mere speculation. Similarly, assuming that the FT9 will be successfully developed, the record contains no reasonably current assessment as to when such an event is likely to occur. Indeed, if the FT9 development program is delayed for a significant period of time, U.T. may lose any opportunities it might have to enter any market which may develop.

Assuming that the FT9 obtains service approval from the Navy within a reasonable time, the next question is whether there will be a market for such a gas turbine system. Market opportunities appear to reasonably exist within the foreseeable future only as to certain proposed classes of ships. Specifically, these are the Surface Effect Ship (SES), the ships involved in the AEGIS program, the VSTOL Support Ship (VSS),[14] and possibly larger hydrofoil or other experimental vessels. B&W has not proven any reasonable probability that a successful FT9 would be employed in any existing class of ships.

SES represents a new and experimental ship design. It is designed for extremely high speed surface travel. It appears that current plans call for the first ship to be about 2,800 displacement tons and to be propelled by approximately 60,000 shp gas turbine engines. A reliable, durable, and economical 30,000 shp gas turbine engine would probably propel such a ship. However, a lead ship has not yet been authorized by Congress.[15] In view of the extremely high development costs for such a ship and the serious questioning within the Department of Defense regarding the advisability of such a class of ships, the Court cannot find a reasonable likelihood that said ships will be authorized; nor can the Court reasonably project the number of ships which would be built if this class is authorized. In any event, it appears that the SES could not, in either its present or any reasonably conceivable form, accommodate either a nuclear or fossil steam propulsion system.

The Aegis system ships currently being considered are the Nuclear Powered Strike Cruisers (CSGN) and the Guided Missile Destroyer (DDG). It appears that the CSGN, if authorized by Congress, would both have an offensive capability and contain the complex Aegis air defense system; it would be nuclear powered. The DDG ships would be smaller and similarly fitted with the Aegis defense capability. The Navy would like a number of each class of ship.

Final decision as to the development of either or both of these ships rests with Congress. As evidenced by Title VIII of the Department of Defense Appropriation Authorization Act of 1975, 10 U.S.C. § 7291 note, a considerable number of our elected representatives favor nuclear propelled ships. Others favor conventionally powered ships. The same difference of opinion exists within the Department of Defense and the Navy itself. To confidently predict the outcome of this struggle would require insights not possessed by this Court.

In any event, it appears reasonably clear that Aegis system ships will be built and that gas turbine and nuclear systems are each being seriously considered. Returning

---

14. VSTOL stands for vertical/short take-off and landing.

15. Two 100 displacement ton experimental vessels have been built and are being tested. One of these vessels employs U.T.'s gas turbines.

to the original inquiry, if the DDG ships are not built, this potential opportunity for the FT9 is eliminated. However, even if some DDG ships are authorized, it appears reasonably certain that the FT9 would not be chosen as its propulsion system. First, the Navy has already proposed that the DDG class have the same basic hull and propulsion system as the Spruance. This decision effectively establishes G.E.'s LM2500 as the gas turbine system for such a ship. Second, even if this proposal is changed, a result which does not appear likely, the FT9 would most probably have to be combined with a smaller gas turbine for economical operation and long cruising range. Currently approved gas turbines in the 5,000 shp and 20,000 shp ranges would not be acceptable. A new 10,000 shp gas turbine would probably have to be developed. While it appears that developmental work on such a gas turbine has begun, or is about to begin, there is considerable doubt that it could be completed, tested and approved in time for installation in any DDG ships authorized. In summary, there is not a substantial market opportunity for the FT9 in the Aegis program.

Another proposed class of ships which might employ a gas turbine system in the power range of the FT9 is the so-called "mini" carrier, the VSTOL Support Ship (VSS), which would be completed in the mid 1980's. The Navy has proposed three designs for such a ship, each of which would be fossil fuel propelled. The first design calls for gas turbine propulsion capable of producing 40,000 shp. The second design also calls for gas turbine propulsion but at the 90,000 shp level. The third design, which would be the largest ship, calls for a fossil steam propulsion system capable of producing 100,000 shp.

An assessment of these designs is important to an understanding of the market opportunity for the FT9 class gas turbine. Each of these designs were drafted upon the assumption that a 20,000 shp gas turbine would be used. In view of the size of the second and third proposed designs, a larger gas turbine, perhaps in a combined system, would be utilized if available. This fact, plus the fact that the Navy has inquired of B&W regarding auxiliary steam boilers which could be used to supplement a gas turbine system, suggests that fossil steam systems are no longer a serious candidate. The Court so concludes in light of the Navy's clear preference for gas turbine systems.

In any event, the VSS program is essentially an alternative to continued construction of the nuclear powered Nimitz class aircraft carriers. Whether the VSS program will be authorized by Congress is dependent upon a number of factors including, most significantly, the nuclear/non-nuclear debates. This Court is simply unable to predict with any degree of certainty whether the VSS ships will be built. Therefore, the market opportunity for the FT9 for the "mini" carrier must be classified as tenuous at best.

The only remaining markets for a 30,000 shp gas turbine is in possible future designs of various types of ships. For example, a large hydrofoil might employ such a system. However, analysis predicated upon such possibilities constitutes mere speculation at this time and on this record.

The third and final consideration is the potential share of any future market which U.T.'s FT9 may obtain. Since the Navy has and currently is funding the development of the FT9, it would appear reasonably likely that this gas turbine would be seriously considered for any future vessels which may be authorized. However, the FT9 would by no means be guaranteed a position in this assumed future market. General Electric is developing a gas turbine in either the same or larger power range as the FT9. In view of G.E.'s financial and technological capabilities and its proven track record in naval propulsion systems, this new gas turbine, the LM5000, would pose a significant threat to the market prospects of the FT9. It must be remembered that during the Navy's testing of gas

turbines, U.T.'s FT4 was tested first, and then replaced by the LM2500. The superior performance of the LM2500 has made it the virtually unchallenged gas turbine propulsion system at its power level in the U.S. market. Such a competition between the FT9 and the LM5000 could well yield the same results.

In summary, U.T. may be reasonably expected to compete for sales of the FT9 if it is a timely technological success; if a market for such a system develops; and if there is a reasonable probability that U.T. would obtain a significant portion of such a market. Within the foreseeable future and on the basis of this record, the Court can make an affirmative finding only as to the last condition. The Court cannot find a reasonable probability that U.T. will become a competitor for the sale of the FT9 within a naval propulsion system market.

The Court next turns to the definitions of the relevant markets. Commercial marine propulsion systems, manufactured either internationally or domestically, do not constitute a market within which gas turbines compete. B&W has apparently recognized this, for it urges in its post trial brief solely that the design, production and sale of U.S. military surface marine propulsion systems constitute the relevant market.

As military surface vessels include both auxiliary and combat ships, the relevant propulsion systems are nuclear steam, gas turbine, diesel, and fossil steam. Assuming for the moment that these systems compete within the same market, competition between these systems must be found.

Yet auxiliary and combat vessels have vastly different propulsion requirements. Practically speaking, diesel and fossil steam systems are no longer competitive with gas turbines and nuclear steam systems for combat vessels. Similarly, only diesels and fossil steam systems compete for auxiliary vessels. The Court concludes that propulsion systems for auxiliary and combat vessels should properly be considered as separate lines of commerce.

U.T.'s only sales in the naval auxiliary vessel propulsion system market were for the two Coast Guard Polar class ice breakers. The last sale occurred in December, 1973, and no more of these ships are planned. It is with some hesitancy that the Court has included them within the auxiliary vessel classification, for their unique function and power requirements sharply differentiates them from nearly all other auxiliary vessels.

There are virtually no prospects for sales of gas turbines by U.T. or any other gas turbine manufacturer for auxiliary vessels within the foreseeable future. Therefore to conclude that U.T. competes in such a market would ignore reality.[16]

U.T. has not sold any of its gas turbine systems for naval surface combat vessels since and including Fiscal Year 1970. Again, it is apparent that U.T. does not compete in this market with its present gas turbine systems.

Even if both auxiliary and combat vessel propulsion systems are within the same market, the same result obtains. The simple fact is that U.T.'s present gas turbine systems, the FT4 and its variations, are not competing in this market. This system is not even approved by the Navy, and there is no substantial evidence that U.T. has even bid on any of the new classes of vessels authorized since Fiscal Year 1970. U.T. is not an effective competitor with this product. Cf. *United States v. General Dynamics Corporation*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

Nor is U.T. presently competitive in such a market with its FT9. This system is in the development stage and the Court cannot state with certainty that it will be a

16. In fact, B&W has not competed in this market since Fiscal Year 1970; it is only now preparing to reenter this market.

technological success. That U.T. will become a competitor within the near future with the FT9 is not established by this record. Cf. *BOC International Ltd. v. F.T.C.*, 557 F.2d 24 (2nd Cir. 1977).

The reference to the design and production of such systems is unavailing. It is clear that U.T. is engaged in such projects, as evidenced by its contract with the Navy to develop the FT9. It appears that B&W is also involved to some degree in such projects, at least as to componentry for nuclear systems; however, the extent of this involvement has not been proven.

■ Yet it is clear that other corporations are involved in such projects. General Electric is developing its LM5000. Smaller manufacturers of gas turbines are probably developing smaller shaft horsepower gas turbine systems for naval use. Westinghouse may be developing new systems. Similarly, Combustion Engineering, one of B&W's chief competitors, is often engaged in designing and developing new boilers for marine use. Assuming that a market for design and production of such systems exists, this record fails to establish the actual size thereof or the percentage share thereof enjoyed by whichever business entities compete therein. As there is no market share data, which is the primary index of anticompetitive effects, *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); or other evidence establishing anticompetitive effects in this single consumer market, this Court cannot find a violation of Section 7, either as to solely a design and development market, or as to a larger market which has design and development as a component element thereof.

If design and development of such systems is considered merely as part of a process leading to sale of surface marine propulsion systems, its independent analytical value is *de minimus*, and only the sale of such

systems or the prospects thereof need be examined.

Thus the Court concludes that regardless of the market definition employed, U.T. is not now, nor is it established that within the foreseeable future it will be in competition with B&W's products in any marine propulsion system market. Further, B&W has failed to prove that any anticompetitive effects will result from the proposed acquisition as to an assumed market for the design and development of marine propulsion systems.

## 3. INDUSTRIAL POWER GENERATION

It appears that B&W also claims that the proposed acquisition may cause anticompetitive effects in a market for industrial power generation equipment. Industrial boilers, fueled either by fossil fuels or waste heat, produce steam for electrical generation, equipment drive and process application. Simple cycle and combined cycle gas turbine systems also perform these functions. It appears that both B&W and U.T. compete for the sale of their respective products for these purposes.

■ The evidence offered at trial is totally inadequate to meaningfully analyze the market effects of the proposed acquisition in this area. The market is not adequately defined nor is there adequate market share data. But the evidence which has been received is adequate to establish the insufficiency of this claim. Chart VI compares B&W's domestic orders for industrial boilers to U.T.'s orders for gas turbines for the period of 1972 through 1976. As is apparent therefrom, U.T.'s share of the assumed market is less than one percent. When it is remembered that there are numerous other boiler and gas turbine manufacturers also selling their products to the various industries involved, it is clear that U.T.'s share of such a market is *de minimus.*

This claim need not be further discussed.

## CHART VI

### ORDERS - (Millions of Dollars)

|  | 1972 | 1973 | 1974 | 1975 | 1976 | Total |
|---|---|---|---|---|---|---|
| **B&W**<br>Boilers | 64.4 | 112.5 | 110.0 | 43.4 | 37.8 | 369.1 |
| **U.T.**<br>Gas Turbines | 1.269 | -0- | 1.965 | -0- | -0- | 3.234 |

### 4. CONSTRUCTION OF POWER GENERATION PLANTS

B&W further claims that the proposed acquisition may tend to substantially lessen competition between the parties' construction companies. Said companies install electric generation systems and componentry as a complete system for purchasing utilities. B&W's construction company has bid on numerous combined cycle plants; thus far it has not been awarded any contracts for such plants. Its contracts have been for the installation of fossil and nuclear steam plants.

█ Numerous companies offer to install electric generation equipment and componentry, whether manufactured by them or other companies. It is clear that often the utilities or their agents perform the actual construction of the subject plants themselves. Yet this record contains no substantial evidence of the numbers of companies involved or the market shares enjoyed by any company. Absent such information, the Court cannot find any substantial anticompetitive effects in this market.

### 5. WASTE INCINERATION/GENERATION EQUIPMENT

█ The next area of claimed horizontal anticompetitive effects is in waste product incineration/generation equipment. Apparently B&W presently markets steam generation incineration equipment which is used primarily by municipal governments and industries for the disposal of refuse and solid wastes. U.T.'s Hamilton Standard Division markets fermentation systems, and is developing a pyrolytic conversion demonstration plant; these systems apparently produce fuels from waste materials. It also appears that B&W is considering developing pyrolytic conversion plants.

Again, the record contains no evidence as to the size of such a market, current market share, or projected market share.[17] These evidentiary failures totally preclude either a market definition or a determination of probable anticompetitive effects.

### 6. RESEARCH AND DEVELOPMENT—ELECTRICAL GENERATION EQUIPMENT

█ Finally, B&W asserts that there may be horizontal anticompetitive effects within a market for research and development of power generation equipment. Both B&W and U.T. are actively engaged in power generation research. However, B&W's research programs are generally directed more toward product improvement than product development; it usually "mon-

---

17. One exhibit contains estimates of U.T.'s present and expected shares of such a market. Its present share is estimated to be 0.9%. This data alone is totally insufficient for meaningful analysis.

itors" research by other firms unless and until it receives a substantial and comparatively immediate market opportunity. U.T. is heavily involved in research programs in a wide variety of areas, including electrical generation.

Both corporations perform research and development in electrical generation systems for various organizations, both publicly and privately sponsored. Yet it is apparent that many other companies perform such research for said organizations. The total size of any research and development market for such systems or the parties' relative shares thereof are not established. The Court finds that B&W has failed to establish any anticompetitive effects in this assumed market.

## B. VERTICAL

In addressing the asserted horizontal aspects of the proposed acquisition, the Court's analysis focused essentially upon power generation equipment in specified industries and referred to B&W and U.T. as corporate entities. The vertical claims, however, dictate a different approach. Herein the Court deems it appropriate to discuss B&W's and U.T.'s products in relation to their respective divisions and subsidiaries.

Typical of most multi-billion dollar corporations, B&W and U.T. are highly diversified enterprises offering a broad spectrum of products and serving a wide variety of markets. Beyond the power generation equipment market, however, their major areas of endeavor are quite dissimilar as illustrated by the brief corporate descriptions given above. Moreover, this dissimilarity is reflected in their respective manner and philosophy of corporate growth.

As noted in its 1976 Annual Report, the expansion and development of B&W has largely been the result of "the integration of specially engineered industrial products needed for its own use and the extension of these products to other users." B&W Annual Report 1976 at 15. By contrast, U.T. has achieved a significantly broader business base through a combination of selective acquisitions and internal growth. Its products reflect its commitment to a leadership position in high technology markets. In some instances, the parties' products are related and are consumed by the same industries. Whether and to what extent they do and/or may stand in the relationship of supplier-customer with regard to their respective product lines is the next issue to be addressed.

The Fossil Power Generation Division of B&W's Power Generation Group [18] has manufactured waste heat boilers for use in combined cycle systems by the electric utility industry. U.T., as noted above, produces gas turbines for use in such systems, and further offers to supply an entire system.[19] Thus, B&W would appear to be a potential supplier of waste heat boilers for U.T. B&W is not, however, a major factor in the waste heat boiler market as it relates to combined cycle systems. Only two B&W waste heat boilers are in operation in such plants today, and there are no current orders outstanding for such B&W boilers.

Although U.T. has sold twenty-three gas turbines for combined cycle plants, it plays an insignificant role as consumer in this product market. In twenty-one of the twenty-three sales, the utility purchasing the system chose the waste heat boiler to be used, and in the two sales where U.T. supplied the entire plant, it chose waste heat boilers manufactured by competitors of B&W. Thus in the limited instances where

---

18. The B&W products broadly categorized as steam generating and associated equipment are produced by its two key operating groups: Power Generation Group, and Industrial Products Group. Each of these groups is comprised of a number of divisions and wholly owned subsidiaries responsible for the manufacture and sale of the products to be discussed herein.

19. U.T. does not manufacture waste heat boilers and there is no evidence that it is likely to do so in the foreseeable future.

it has acted as a supplier of the total combined cycle system, U.T. has not purchased boilers from B&W. Whether it will do so in the future is dependent upon a number of factors not fully developed by the evidence. In other words, as a supplier for utilities U.T. must consider in making its component purchasing decisions the cost, quality, fitness for the intended use, and availability of the product. Such considerations are commercially mandated in order for U.T. to continue as a responsive supplier. Thus the probability of its consuming only B&W waste heat boilers in the future is not great. Additionally, the existence of a significant market for gas turbines with waste heat boilers in a combined cycle system for other than peaking purposes in the foreseeable future is doubtful. As discussed above, the present utility market for such systems for peaking purposes is marginal representing only 0.775% of total installed electrical generator capability as of December 31, 1976, and its future prospects for growth are not bright.

TLT–Babcock, Inc. is a joint venture by B&W and Turbo Lufttechnik GmbH (TLT) of West Germany to market TLT axial and radial fans in the United States. Actually TLT alone possesses the patents, know-how, and experience to manufacture these fans; B&W supplies the sales organization and other facilities needed to promote fan applications and sales. These axial and radial fans are used as utility boiler draft fans and industrial draft fans, and TLT–Babcock is assertedly the largest supplier of axial flow fans for the former application.

The Hamilton Standard Division of U.T. is the largest fabricator of fixed and variable pitch aircraft propellers. In 1974, much consideration was given by TLT–Babcock to sub-contracting the manufacture of fan rotor assemblies needed in the manufacture of its fans to Hamilton Standard. Said arrangement, however, was apparently not effected.

It further appears that also beginning in 1974 Hamilton Standard explored the possibility of entering the axial and radial flow fan market itself through an arrangement with American Standard. Independent studies commissioned by Hamilton Standard counseled against such action; they instead recommended that Hamilton become a secondary supplier offering sub-systems or components for these fans. The 1977 Business Plan of Hamilton Standard indicates that it is in fact not seeking to enter the axial and radial fan market, but merely preparing to supply American Standard with the aforesaid sub-systems. Although its long range plan envisions evaluation of a broader product line in this area, this is only a future possibility.

Within B&W's Industrial Products Group is the Bailey Meter Company, the largest U. S. manufacturer of combustion control equipment, and the only producer of a full line of analog and digital combustion controls. Bailey supplies controls for utility power generation equipment, marine applications, and industrial uses.

In the utility area, control equipment falls into two categories: complete control systems, such as those provided for a complete nuclear or fossil plant; and the subsystems and components for utility controls. Bailey manufactures both categories of controls for nuclear steam, fossil steam, gas turbine, and combined cycle electric generation systems. In 1976, based on domestic orders, Bailey had a 48% share of the market for control systems for fossil and nuclear steam systems. Its share of the domestic utility fossil boiler market alone was 32% for the same year. While Bailey has made proposals to competitors of U.T. to supply controls for gas turbine and combined cycle plants, its position as a significant supplier or competitor in these areas has not been demonstrated. Neither the market for such controls nor Bailey's position therein has been shown. Likewise, Bailey is not a present supplier of controls for gas turbine and combined cycle systems to U.T. The establishment of such a relationship is only a future possibility since numerous other factors enter into the decision of a purchaser, such as U.T., when securing the necessary components for its systems. Moreover,

in view of the above detailed dim future projected for both gas turbine and combined cycle systems in utility peaking and non-peaking applications, the control market therefor will not be substantial in years to come. With regard to industrial applications for such systems, there has been no showing of the nature and extent of the control market or the parties' respective shares of any such market.

Bailey Meter is also a supplier of controls for industrial and marine boilers. Its share of such market based on U. S. orders in 1976 was 13%. Finally, Bailey is a manufacturer of control systems for fluid processing. Based on U. S. orders, its share of such market in 1976 was a mere 10%. Within this market, Hamilton Standard also produces transducers which measure flow and temperature. There has been, however, no serious attempt to show the significance of these markets and the corresponding market shares.

Belfab, a subsidiary of Bailey Meter, manufactures welded metal bellows which consist of an assembly of thin metal discs welded together to form a nearly airtight flexible tube. Such a tube both seals and allows for motion such as contraction and expansion. These bellows are used in aircraft, rockets, jet engines, and various industrial applications. Bellows and bellow seals for some jet engines and rockets are sold by Belfab to U.T. Likewise, Belfab supplies pressure sensor bellows to Hamilton Standard. The nature and extent of this market and the purchases by U.T. have not been demonstrated, however.

Another of B&W's subsidiaries, Control Components, Inc., (hereinafter CCI), designs and markets specialty control valves and valves for very severe applications. CCI's involvement in the control valve market is limited to the problem valve segment which comprises about 15% of the total control valve market. Its share of this submarket is claimed to be about 14% for special control valves, and over 50% for very severe applications.

CCI's business does not extend to conventional control and regulator valves. Rather, it is concerned with producing devices which eliminate performance problems such as noise, erosion, and erratic control encountered by the conventional valves. CCI manufactures a patented device known as the "Self Drag" control valve to control the pressure, temperature, flow, and fluid velocity of liquids, gas and steam. This particular device for very severe valve applications is heralded by CCI as the greatest technological advance in the valve market in the past thirty years.

The valves manufactured by CCI are sold to public utilities, power generation equipment systems suppliers, and the hydrocarbon processing, marine and aerospace industries. The majority of its sales in these areas are for custom-built equipment, that is, valves made pursuant to a customer's specifications. CCI has at least four major competitors in the valve market: Fisher Controls, Masoneilan, Valtek, and Copes-Vulcan.

A significant portion of CCI's valves are made for power generation applications and are used in connection with fossil steam, nuclear steam, and simple and combined cycle gas turbine systems. These sales to utilities are the result of either direct dealing with the utilities themselves or through power generation equipment suppliers. CCI has sold valves to Westinghouse for use in its Pace combined cycle plants. It has not, however, made any such sales to U.T. for its combined cycle systems.

Although CCI appears to have supplied some valves to U.T.'s Pratt & Whitney Group, which essentially manufactures aircraft engines, there has been no showing as to the nature, extent, purpose, and time of such sales. Likewise, CCI has not been shown to be a major supplier of valves to U.T., and U.T. has not been shown to be a significant consumer of the same. Assuming arguendo that both of the above had been shown, the sub-market comprised of

specialty and severe application valves has not been demonstrated to be substantial.

The Automated Machine Division (hereinafter AMD) of B&W's Industrial Products Group manufactures precision machine components, machine tools, and cutting tools. It is the leading supplier of broaching machines in the U.S. with no less than 40% of that market, and claims to be the largest or second largest manufacturer of broach cutting tools with approximately a 15% share of the domestic market therefor. In each market, AMD has at least four or five major competitors and numerous smaller ones.

Broaching machines are devices which employ a broach cutting tool to remove metal from a work piece. A broach cutting tool is a uniquely engineered cutting tool utilizing a machine tool to remove metal in mass precision and production applications. Both the broaching machine and especially the broach cutting tool are designed and produced for a particular application of the customer according to the latter's specifications. For example, a broach cutting tool manufactured for a General Electric gas turbine cannot be used for any other gas turbine.

Approximately 60% of AMD's sales are in machine tools, and 25% of that amount represent sales of broaching machines. Cutting tools in turn represent about 20% of AMD's business, and the broach cutting tools' share thereof constitutes 80%. AMD's primary customers, representing 60% of its sales of broach cutting machines and tools, are the manufacturers of internal combustion engines. This group includes the automotive industry, construction equipment industry, and farm equipment industry. The gas turbine industry constitutes AMD's second largest customer with an average of between 10% and 15% of its sales of the aforesaid machines and tools being made thereto.

Although U.T. purchases broaching machines, since at least 1972 it has not purchased the same from AMD. Broaching machines are sold to U.T. by Excello Corporation, one of AMD's major competitors. Moreover, at the present time, the type of machine being used by U.T. in certain of its broaching applications is not manufactured by AMD. Broach cutting tools are supplied to U.T. primarily by AMD, Hudson Broach Company, and Southeast Broach Company. AMD's total sales of such tools in 1976 amounted to approximately in excess of six million dollars, and yet its sales to U.T. were only about two hundred thousand dollars or 3% of said total.

AMD is also a manufacturer of ceramic cutting tools. These tools are also used to remove metal from piece work, but unlike broach cutting tools, indexable insert ceramic cutting tools are general devices not uniquely engineered for specific applications. They are in competition presently with tungsten carbide cutting tools and not broach cutting tools. The ceramic cutting tools represent a new technological thrust for AMD. Although AMD is not a dominant force in the tungsten carbide-ceramic cutting tools market presently, it claims an estimated 30% share of the U.S. market for ceramic cutting tools, including imported tools.

The ceramic cutting tools made by AMD are sold to General Motors and their divisions, Pratt & Whitney, and numerous other customers. Approximately 20% of AMD's sales in this area are to GM and only about 10% are to Pratt & Whitney. AMD is, however, interested in pursuing Pratt & Whitney as a major potential customer, and has recently acted to expand present facilities in an effort to achieve this goal. It has not, however, been established that this market is substantial or that Pratt & Whitney's purchases are significant for such products. Moreover, Pratt & Whitney has purchased ceramic cutting tools from competitors of AMD, and in light of the general nature thereof, is likely to do so in the future.

The vertical turret lathe is a new product introduced by AMD about one month ago.

AMD hopes to be able to sell this product to the automotive industry, heavy equipment manufacturers, jet engine manufacturers, and others. At the present time, however, insufficient information has been shown to determine its potential future market.

B&W's Refractories Division (hereinafter RD) manufactures and markets refractory products which are materials capable of withstanding high temperature applications. It is a significant competitor in the market for such products as ceramic fibers and insulating firebrick. RD's refractory products are utilized in utility fossil steam systems, industrial furnaces, and automotive applications among others. U.T. is viewed by B&W as a potential customer for ceramic fibers in two applications: the external insulation of jet engines, and jet engine noise control. U.T. is not presently a customer of RD in these areas, and at least with regard to the former application, B&W has not supplied anyone else therewith. Moreover, the nature and extent of RD and U.T.'s customer-supplier relationship, if any, has not been shown. There is no evidence as to such a present relationship, and a future one is merely possible at best.

The Tubular Products Division (hereinafter TPD) of B&W is a leader in the production of such steel tubular products as welded and seamless tubing, pressure tubing, mechanical tubing, fittings, and extruded shapes. The industries served by such products include the following: automotive, bearing, petroleum, and machinery. It appears that TPD has supplied some of its products to Otis Elevator, a subsidiary of U.T.; those sales have not, however, been shown in the perspective of any particular market or market share. In other words, TPD has not been shown to be either presently or potentially a significant supplier for U.T. in any substantial market for these products. Outside of the limited sales to Otis referred to above, any relationship between TPD and U.T. is indirect at best, i. e. TPD supplies bearing tubing to bearing manufacturers whose bearings, in turn, are used in rotating equipment such as helicopters and gas turbines.

The major product manufactured by the Diamond Power Specialty Corporation, a division of B&W's Industrial Products Group, is combustion cleaning equipment. Such equipment is utilized in conjunction with utility and industrial fossil steam and combined cycle systems. Diamond, with an overall market share of 65% for such equipment, is clearly the market leader. Its customers consist of the fossil steam and combined cycle system suppliers and the end users thereof, namely, utilities and industry.

Although not shown to be a present customer, U.T. as a supplier of combined cycle systems could possibly purchase combustion cleaning equipment from Diamond. There has been no showing, however, that it has made such purchases, and there is no evidence from which the Court can evaluate the likelihood of future purchases. Thus the development of a significant supplier-consumer relationship between Diamond and U.T. in the foreseeable future has not been established.

In the manufacture of certain of its products, B&W utilizes wire and cable products, and castings. Examples thereof include its control systems and valves. U.T.'s Essex Group manufactures wire and cable products, and Otis Elevator makes castings. There has been, however, no serious attempt to show a significant customer-supplier relationship between B&W and U.T. in these areas. Rather, B&W has only alluded to the possibility thereof. The development of such a relationship is dependent upon the ready adaptability of U.T.'s products to B&W's applications. Again, there has been no showing of the reasonable likelihood of the same within the foreseeable future.

Based on the foregoing, B&W contends that in the areas of energy production and defense or government contracting the combination of B&W and U.T. would not only eliminate direct competition between the two, but also create substantial vertical foreclosure. In other words, the combination would assertedly eliminate the two as substantial customers in various markets, and would potentially eliminate them as

suppliers to competitors. U.T. in response argues that B&W's assertions are wholly speculative and not founded in fact.

An economic arrangement whereby two corporations stand in the relationship of supplier-customer has been denominated "vertical." As recognized by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. at 323–24, 82 S.Ct. at 1523:

> The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a "clog on competition," *Standard Oil Co. of California v. United States*, 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371, which "deprive(s) * * * rivals of a fair opportunity to compete." H.R.Rep. No. 1191, 81st Cong., 1st Sess. 8.

■ Section 7 of the Clayton Act does not, however, proscribe all such vertical acquisitions or mergers. Rather, as stated above, it renders unlawful only those arrangements which may substantially lessen competition in any line of commerce in any area of the country. Thus the initial step in finding a Clayton Act violation in the vertical aspects of a proposed acquisition is to determine the relevant product market and geographic market.

Unlike the electrical power generation area, there has been little attempt to carefully define either the product or geographic market for the myriad products manufactured by B&W and U.T. The Court cannot accept a mere product name and definition alone as constituting a substantial market for purposes of Clayton Act analysis. The parameters of any given market must be explored by reference to a product's uses and the substitutes therefor. Moreover, within any given market there may be submarkets which in and of themselves constitute a line of commerce, *Brown Shoe Co. v.*

*United States*, 370 U.S. at 325, 82 S.Ct. at 1524.

Thus the Court is unable to adequately appraise the real market for each of the numerous products listed by the parties. Illustrative of the quandary in which the Court finds itself and the error attendant in accepting only product definitions as markets is the asserted ceramic cutting tools market. These tools apparently compete presently with tungsten carbide tools. It is possible, indeed probable, that these two together comprise a market. It is also possible, however, that they do not, and that other products may have to be included with them in a single market. Yet this record fails to answer these questions.

■ Thus the Court must conclude that plaintiff has failed to establish the relevant lines of commerce for the numerous products discussed herein. Likewise, there has been no presentation as to what should constitute the geographic market for the various products beyond references to the U.S. or domestic market. It appears to the Court that the relevant geographic market for each product is the entire United States.[20]

In light of the failure of proof on the relevant market issue, the Court is unable to adequately appraise whether the effect of the acquisition may be to substantially lessen competition or create a monopoly in the relevant markets. Yet discussion of the factors relevant to such analysis is instructive.

■ In determining the effect of a vertical arrangement, the first important factor for consideration is the size of the market share foreclosed since the illegality in such arrangements generally stems from the foreclosure of a share of the relevant market otherwise open to competitors. *Brown Shoe Co. v. United States*, 370 U.S. at 328, 82 S.Ct. at 1525. Market share is, however, determinative in a vertical ar-

---

**20.** In so concluding, the Court is cognizant of the fact that frequent references to foreign competitors have been made in connection with various products, and that imported products have thus been considered in some cases.

rangement case only where it approaches either monopolistic or de minimus proportions. *Id.* at 328–29, 82 S.Ct. at 1525–26. Such is not the case herein since absent a determination of the relevant markets, this factor cannot even be calculated. Moreover, in the limited circumstances where the record contains some market share information as to a particular product, other evidence or the lack thereof precludes a finding of anticompetitive effects from the acquisition. For instance, with regard to the combustion cleaning equipment supplied by B&W's Diamond Power division, there is no evidence that U.T. now or in the foreseeable future is likely to be a significant purchaser thereof.

■ It is thus incumbent upon the Court to look at various other economic and historical factors. Two key factors to be examined are the nature and purpose of the arrangement, and the trend toward concentration in the industry. *Id.* at 329, 332, 82 S.Ct. at 1525–26. Neither of these factors, however, can be evaluated in a vacuum; they become meaningful only in the context of a substantial product market. Mere allegations of the foreclosure of a supplier's competitor from its product markets and the elimination of a significant customer do not constitute proof of market foreclosure. Indeed there has been no showing of any anticompetitive purpose for the acquisition or trend toward concentration in any affected industry.

■ The Court finds a failure of proof as to those other factors deemed indicative of an anticompetitive vertical acquisition. There has been no showing that the acquisition of B&W by U.T. would eliminate U.T. as a potential entrant into any B&W product market, or vice versa. *Ford Motor Company v. United States*, 405 U.S. 562, 567, 92 S.Ct. 1142, 1146, 31 L.Ed.2d 492 (1972). Nor has there been a showing that the combination of the two would result in heightening the barriers to entry into any

product market. *Id.* at 568, 92 S.Ct. at 1147.[21]

On the other hand, the Court notes that significantly there is evidence demonstrating that the probable effect of the arrangement will not be anticompetitive. U.T. is a conglomeration of divisions and subsidiaries operated as separate profit centers. Each division manager is responsible for the profitable performance of his section, and his compensation is in part dependent thereon. Thus the incentive exists for a division to purchase its necessary product supplies in accordance with four general principles: specifications, quality, cost, and delivery time. As a result, the best supplier, and not necessarily a supplier from within U.T.'s organization, is sought. Evidence of this is found in the fact that in 1976, U.T.'s in-house purchases were less than 10% of their total component purchases. Illustrative of U.T.'s extra-company purchases despite the availability of the same products intra-company are Sikorsky's purchase of aircraft engines from General Electric, and Pratt & Whitney's purchase of fuel controls from Bendix.

Additionally, other factors militate against the establishment of a captive supplier relationship between B&W and U.T. upon acquisition. The products designed and manufactured by both represent highly developed and refined technologies. The consumers thereof, such as the utility and automotive industries, are quite sophisticated and engage in a multi-faceted purchase decision making process. Numerous factors including a product's price, efficiency, quality, characteristics, useful life, availability, and reliability need be weighed. Thus it is not commercially advisable for U.T. to restrict B&W and itself to in-house purchases in manufacturing its respective products.

Accordingly, the Court concludes that it is not probable in the foreseeable future that the proposed combination of B&W and

---

**21.** The Court will discuss in greater detail these theories and their relation to the proposed acquisition in its consideration of the conglomerate aspects thereof.

U.T. will foreclose either's competitors since U.T. is not likely to force B&W to purchase its products, nor restrain B&W from selling to its competitors. Thus the Court finds that a vertical acquisition violative of the antitrust laws has not been established herein.

## C. CONGLOMERATE—PRODUCT–EXTENSION

Lastly in dealing with B&W's antitrust claims, it is necessary for the Court to address the asserted conglomerate or product-extension aspect of the proposed acquisition.

■ An acquisition is classified as conglomerate if the two firms united thereby each operate in markets that are not horizontally or vertically related to those in which the other functions. In a pure conglomerate arrangement there are no economic relationships existing between the acquiring and acquired firm. *F.T.C. v. Procter & Gamble Company*, 386 U.S. 568, 577 fn. 2, 87 S.Ct. 1224, 1229 fn. 2, 18 L.Ed.2d 303 fn. 2 (1967). Clearly, the proposed acquisition of B&W by U.T. cannot be considered a pure conglomerate arrangement. Although the two firms function in markets which are horizontally unrelated, there are horizontal and vertical interfaces between the two. In other words, there are instances in which they stand in the economic relationship of supplier-customer and others in which they directly compete. Where there are no horizontal or vertical relationships, those product lines can be analyzed as conglomerate.

It is perhaps more accurate to term the proposed acquisition a "product-extension merger." Many of the products of B&W are complementary to those of U.T., require related technologies, and are marketed in the same manner and to the same ultimate consumer. The language of the Federal Trade Commission describing the acquisition of Clorox by Procter & Gamble is, in part, appropos herein:

"By this acquisition * * * Procter has not diversified its interests in the sense of expanding into a substantially different, unfamiliar market or industry. Rather it has entered a market which adjoins, as it were, those markets in which it is already established, and which is virtually undistinguishable from them insofar as the problems and techniques of marketing the product to the ultimate consumer are concerned."

*F.T.C. v. Procter & Gamble Company*, 386 U.S. at 577–78, 87 S.Ct. at 1230, quoting 63 F.T.C. ——, ——. Illustrative of the above is U.T.'s future entrance into the fossil boiler and nuclear steam markets through B&W. These markets are of course different from but adjacent to the gas turbine market for utility, marine, and industrial uses.

In any event, whether the acquisition is more aptly denominated conglomerate, or product extension is not particularly relevant. There is an affinity between these two types of analyses, and the difference between them is a mere matter of degree. Both fall within the ambit of Section 7 of the Clayton Act, and the same theories are applied in determining the illegality of acquisition thereunder. It should be noted, however, that in the case of a conglomerate acquisition there is an additional basis upon which to predicate a finding of illegality which is not applicable to a product-extension merger, namely reciprocity.

As with the other modes of analysis, the Court's analysis herein must commence with the relevant market definition and the concentration and market share statistics. For purposes of this discussion four relevant lines of commerce will be examined: utility fossil boiler and nuclear steam systems, and marine fossil boiler and nuclear steam propulsion systems. The discussion is so limited because of the Court's earlier findings which indicate a lack of sufficient evidence as to the parties' other products from which a determination of the relevant market definition and market shares could be made.

The U.S. utility fossil boiler market has only four major competitors. Employing domestic utility orders in megawatts for boilers as the statistical measure, B&W garnered a 33.9% share of the market in the period 1967–76, thus ranking second among the four suppliers. See Plaintiff's Exhibit H–4. Moreover, this utility boiler market is highly concentrated as evidenced by the fact that during the same period, the top two competitors, Combustion Engineering and B&W, controlled 75% thereof.

Likewise, the U.S. utility nuclear steam system market has a mere four suppliers. B&W's share of this market, however, was 15.8% for the period 1967–76 and 16.7% for the period 1972–76, using domestic utility orders in megawatts as the indicator. See Plaintiff's Exhibit H–5. As a consequence of its low market share, B&W ranked last among the four market competitors. Nonetheless, the utility nuclear steam market is also greatly concentrated with the top two firms, Westinghouse and General Electric, again controlling a 66.9% share of the market during the 1967–76 period.

Similarly, the U.S. marine fossil boiler and nuclear steam system markets are highly concentrated with few significant competitors. The evidence as to these markets does not, however, include detailed market share statistics as is provided for the aforesaid utility markets.

Since all of the relevant lines of commerce are significantly concentrated, the analysis must proceed to determine whether the proposed merger will enhance the risks of anticompetitive effects presented by such condition. In that connection there are two theories or concepts that need be considered: potential competition, and disparity in relative size.

■ The potential competition theory is actually two distinct theories: the perceived potential entrant doctrine and the actual potential entrant doctrine. The first theory is concerned with the present procompetitive effect upon firms already in an oligopolistic market exerted by a firm standing at the edge thereof and recognized to be a potential entrant into the same. *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 531–32, 93 S.Ct. 1096, 1100, 35 L.Ed.2d 475 (1973). When such potential entrant acquires a large competitor in the market, the procompetitive effect ceases, and there is a corresponding lessening of competition violative of Section 7 of the Clayton Act.

The second theory is concerned with the acquisition of a significant competitor in an oligopolistic market by a firm which may actually in the future enter the market *de novo* or through a "toehold" acquisition of a firm lacking a substantial market share. *United States v. Falstaff Brewing Corp.,* 410 U.S. at 537, 93 S.Ct. at 1103. Upon acquisition, the successful acquiring firm will not in the future enter independently or through a toehold acquisition, and thereby effect a lessening of competition. The validity of this actual potential entrant theory, however, has yet to be expressly recognized by the Supreme Court. *BOC International, Ltd. v. F.T.C.,* 557 F.2d 24 (2nd Cir. 1977), citing *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), and *United States v. Falstaff Brewing Corp., supra.*

■ The initial inquiry then becomes whether U.T. is a perceived potential entrant into the utility and marine fossil boiler and nuclear steam system markets. There has been no showing that U.T. is perceived as a potential entrant in any of these markets by B&W and its respective competitors. Concomitantly, U.T. has not been shown to be exerting a considerable present competitive influence on such markets. Indeed there has been no evidence with regard to the influence of any potential competitors on market behavior. Conversely, B&W is not perceived as a potential entrant into the utility and marine gas turbine markets or into any other market wherein U.T. is a significant competitor.

■ A more difficult question is posed with regard to the applicability of the actual potential entrant theory. In order to determine whether U.T. is an actual poten-

**1286**

tial entrant into any of the four relevant markets under discussion, two questions need be answered: whether U.T. would enter the markets *de novo* or by a toehold acquisition if the proposed acquisition of B&W is prohibited; and whether such *de novo* or toehold entry by U.T. would have procompetitive effects on the relevant markets. *BOC International Ltd. v. F.T.C.*, 557 F.2d at 26–27. The importance of the first of these questions cannot be underestimated:

> If there is no showing that the acquiring firm would have entered the market but for the acquisition—and if the acquiring firm is exerting no present influence on the market as a perceived potential entrant, as is concededly the case here— then it cannot be said that the effect of the acquisition "may be substantially to lessen competition," Clayton Act § 7, 15 U.S.C. § 18.

*Id.* at 27. Moreover, any finding or determination of probable entry must be made in relation to the near future since Section 7 is concerned with probabilities and not remote or ephemeral possibilities. As stated by the Second Circuit in *BOC International Ltd. v. F.T.C.* at 29:

> [I]t seems necessary under Section 7 that the finding of probable entry at least contain some reasonable temporal estimate related to the near future, with "near" defined in terms of the entry barriers and lead time necessary for entry in the particular industry, and that the finding be supported by substantial evidence in the record.

■ U.T. by its emphasis on high technology products, bountiful resources, and presence in the complimentary utility and marine gas turbine markets might be considered a prime candidate for independent or toehold entry. The Court finds to the contrary, however. As stated earlier, gas turbines, fossil boilers, and nuclear steam systems are all distinct and highly developed technologies. These technologies are not readily and economically capable of production by a manufacturer who operates in an adjacent energy equipment market. In other words, absent a showing of U.T.'s capacity or intention to enter these markets, the same cannot be presumed herein. There has been no showing that U.T. is an actual potential entrant within the reasonably near future.

As a necessary precondition to application of this doctrine has not been proven, the proposed acquisition is not thereby violative of Section 7. The Court notes, however, that even if U.T. were an actual potential entrant, its entry would not decrease present competition since the structure of said markets would not be materially altered. Yet while the Court entertains serious reservations as to the validity of this theory, it need not herein decide this issue.

The second theory upon which the Court may predicate a finding of illegality as to a conglomerate or product-extension acquisition is premised upon disparities in the relative size of the acquiring firm and firms in the market already. In other words, a large acquiring firm by entering a concentrated market through the acquisition of a smaller but dominant firm may serve to entrench that firm, and thereby raise barriers to market entry and foster anticompetitive behavior. Such was the condition proscribed by the Supreme Court in the Clorox-Procter & Gamble Merger. See *F.T.C. v. Procter & Gamble Company*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

The Court in that case found that Procter's acquisition of Clorox, the dominant firm in the oligopolistic liquid bleach market, would in all probability rigidify the oligopolistic condition of the market, make Procter the price leader, and thereby dissuade the smaller firms from engaging in vigorous competition. *Id.* at 578, 87 S.Ct. at 1230. Further, the Court found that Procter's dominance would tend to raise the entry barriers making potential new entrants reluctant to do so. *Id.* at 579, 87 S.Ct. at 1230. The vehicle through which Procter could reinforce Clorox's dominance and thus reduce possible future challenges of the same was Procter's advertising budget and ability.

■ As applied to the instant case, B&W is one of the leaders in the utility fossil boiler market. The inquiry then devolves into whether U.T.'s acquisition of

B&W is likely to entrench B&W's position and substantially lessen competition in the market. It is necessary initially to identify some factor or mechanism associated with U.T. which could produce such result. It appears that U.T.'s research and development (hereinafter R&D) capacity and skills constitute the key factor which it could offer B&W. It is undisputed that U.T.'s R&D budget and commitment clearly surpasses that of B&W. That is not to say, however, that B&W is not involved with the same. Rather, U.T. has placed great emphasis on R&D and considers B&W "research poor" in comparison. Unlike the *Procter & Gamble* case, however, there is no indication as to the relative merits of U.T.'s R&D effort. In other words, although U.T. has made a substantial commitment to R&D, there has been no showing as to whether such is comparable to that of other firms in these markets such as Combustion Engineering, or whether such will give B&W a competitive advantage. Thus the Court cannot evaluate the effect this particular aspect would have on competition in the market should the acquisition proceed. It would be wholly speculative to conclude that as a result of U.T.'s R&D capabilities, B&W would become the dominant firm or become so entrenched in its present position as to substantially reduce competition in the fossil boiler market. The Court deals only with probabilities and not mere possibilities. Moreover, most of U.T.'s R&D is in dissimilar areas not readily capable of adaptation to B&W's products.

With regard to the nuclear steam system market, B&W is not a dominant force. Therefore, the likelihood of entrenchment arising through the proposed acquisition does not exist. Essentially, the acquisition as it relates to this particular market is in the nature of a toehold acquisition. Moreover, in view of the lack of sufficient evidence with regard to U.T.'s R&D capacity, the Court cannot conclude that the acquisition would make B&W dominant in this market or stifle aggressive competition by the firms therein.

The marine fossil steam and nuclear steam propulsion systems markets need be viewed in terms of the two broad categories of marine vessels: commercial and naval. Within the commercial shipping arena, B&W is one of the leaders in the fossil boiler market. However, this market will diminish as the more efficient low speed diesel systems become readily available in the United States. B&W has not proven that U.T.'s R&D efforts or any other factors will act to entrench or significantly improve B&W's market position. Due to the capital investment required and lifetime operating cost of nuclear steam systems, such are not feasible for commercial shipping. Thus the market therefor is now, and for the foreseeable future will be, totally insignificant.

With regard to the naval fossil boiler propulsion system market, such a system has not been authorized for a new class of U.S. naval combat vessels since prior to 1970. B&W was, prior to 1970, a dominant force in the markets for both auxiliary and combat vessels; since that time, however, it has allowed its ability to meet naval specifications, as to both auxiliary and combat vessels, to lapse, and is only now attempting to once again attain a significant market position. In that effort U.T.'s R&D will provide no advantage since such is concentrated in areas not readily adaptable to a fossil boiler propulsion system. Lastly, B&W is presently a dominant force in the naval nuclear steam system market. There is no reasonable probability, however, that it will become entrenched as a result of the acquisition since again U.T.'s R&D cannot provide an edge which will assure dominance or hinder competition therein; and no other factor which could achieve such result has been demonstrated.

Therefore, the Court concludes that the acquisition is not likely in the foreseeable future to raise entry barriers or foster anti-competitive conduct in any of the marine markets.

The disparity in relative size concept also contemplates a potential lessening of competition as a result of a large firm acquiring a smaller firm in a concentrated market, and emerging as a price leader. See *F.T.C. v. Procter & Gamble Company, supra.* In that circumstance, such a leader

may chill reasonable competition within the market and raise a barrier to new entry. With regard to the markets under discussion herein, however, there is no evidence that such is the situation now or that such is likely to be the situation in the future. Further, it has not been shown that U.T. has in its present markets facilitated, or probably will in these new markets facilitate, anticompetitive behavior. On the contrary, these markets involve sophisticated suppliers and consumers, and are not conducive to unreasonable market control by a participant. This is particularly true in the single consumer U.S. naval propulsion systems market where a complicated and long standing process of contract review is maintained in order to prevent double profits by suppliers. Thus the Court finds that the acquisition will not in the foreseeable future result in the probable emergence of B&W as an anticompetitive leader in the fossil boiler and nuclear steam markets for utility and marine applications.

■■■ Finally, a conglomerate acquisition may be held illegal under Section 7 because of the opportunity for reciprocity. Reciprocity typically involves an arrangement wherein a firm will buy from another if that other in turn purchases from an affiliate of the firm. See *F.T.C. v. Consolidated Foods Corporation*, 380 U.S. 592, 594, 85 S.Ct. 1220, 1222, 14 L.Ed.2d 95 (1965). An acquisition in which there is reciprocal trading violates Section 7 if the probable effect of the same is to substantially lessen competition. Thus the relevant inquiry is two-fold: whether there is a likelihood of reciprocal trading; and whether the same may substantially lessen competition.

■■■ With regard to the instant case, there is no basis in the record for finding that the acquisition is likely to create reciprocal trading in the utility and marine fossil boiler and nuclear steam systems markets or any other product market within which B&W and U.T. participate. Although in some instances both supply products to the same industries, such as the automotive and utility industries, the probability of a "tie-in" arrangement arising upon acquisition has not been demonstrated. There has been no showing that reciprocal dealing is

the present policy or practice of U.T. despite opportunity therefor, and such is perhaps the best indicator of U.T.'s future course of conduct. Thus, the Court cannot conclude that reciprocal trading will result from the acquisition to the detriment of competition in any substantial market.

No other aspects of the conglomerate or product extension claims are sufficiently substantial to merit discussion.

### D. CONCLUSION

Thus the Court finds that B&W has not proven that the proposed acquisition would violate Section 7 of the Clayton Act. Additionally, the Court concludes that B&W has failed to prove that it would be injured by the acquisition. Therefore plaintiff's first claim for relief is found to be meritless.

### V. ATOMIC ENERGY ACT

Finally, B&W argues that the proposed acquisition by U.T. would violate Section 184 of the Atomic Energy Act, 42 U.S.C. § 2234 in that, if successful, U.T. would thereby acquire control over certain licenses held by B&W. Said section provides in pertinent part as follows:

> No license granted hereunder and no right to utilize or produce special nuclear material granted hereby shall be transferred, assigned or in any manner disposed of, either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person, unless the Commission shall, after securing full information, find that the transfer is in accordance with the provisions of this chapter, and shall give its consent in writing.

The Court finds that the Nuclear Regulatory Commission has not consented to any transfer. In fact, the Commission refused to act to block the proposed tender offer. This decision is presently being reviewed by the United States Court of Appeals for the District of Columbia.

■■■ B&W's claim is meritless, for only the Attorney General may bring an action for a violation of the Act. 42 U.S.C. § 2271. This fact, and the pendency of the review action in the Court of Appeals, renders con-

sideration of the merits of B&W's claim both unnecessary and inappropriate at this time.

## VI. DISCLOSURE

Finally, B&W asserts that U.T.'s proposed tender offer would violate Section 14(e) of the Securities Exchange Act of 1934, as amended 15 U.S.C. § 78n(e). Specifically, B&W asserts that said disclosure contains material misstatements of fact by asserting that the acquisition of B&W poses no antitrust problems; and that U.T. failed to adequately disclose both that said acquisition violates the Atomic Energy Act, and the scope and consequences of certain foreign payments.

As the Court has determined that the proposed acquisition is not violative of Section 7 of the Clayton Act or of the Atomic Energy Act, the subject statements or omissions are not violative of the Securities Exchange Act. Similarly, the Court concludes, as demonstrated in a separate Order, that the proposed disclosure regarding the "questionable" foreign payments does not contain material misstatements of fact or omit to state facts necessary in order to make the statements made by U.T., in the light of the circumstances in which they will be made, not misleading; therefore this component of the final claim advanced is also meritless.

## VII. COUNTERCLAIM

By its counterclaim, U.T. asserts that certain statements made by B&W to its shareholders were materially false and misleading, thereby violating Sections 14(d) and (e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(d) and (e). Upon consideration of the evidence, the Court finds said counterclaim to be meritless.

## VIII. CONCLUSION

In conclusion, the findings of fact and conclusions of law set forth above establish that no legal basis for enjoining either the proposed tender offer by U.T. or the merger of the parties has been demonstrated. Similarly, U.T.'s counterclaim is meritless.

Accordingly, judgment shall be rendered for U.T. as to the claims advanced by B&W, and for B&W on the counterclaim advanced by U.T.

IT IS SO ORDERED.